[No. 9468–8–I.   Division One.   July 18, 1983.]

CHARLES S. FINE, ET AL, *Appellants,* v. MANFRED LABAND, ET AL, *Respondents.*

*Helsell, Fetterman, Martin, Todd & Hokanson, William Helsell,* and *Arden Olson,* for appellants.

*Culp, Dwyer, Guterson & Grader* and *Louis F. Nawrot, Jr.,* for respondents.

CALLOW, J.—Charles S. Fine and Reva Fine, H. Stephen Epstein and Barbara Epstein, appeal a Superior Court judgment, rendered after a nonjury trial, which: (1) awarded Manfred Laband and Karen Laband the market value of Laband's shareholder interest in the lease of a medical office space; and (2) declined to reduce Laband's interest to present value. Laband cross–appeals the trial court's judgment which held that (1) the Fine, Laband and Epstein professional corporation did not have goodwill separate from the doctors' carrying on the practice; and (2) the costs associated with Laband's relocation were not recoverable as part of the fair market value of the leasehold.

The issues presented are:

1. What was the proper legal way to evaluate the leasehold interest of Laband in the premises at 808 Cobb Medical Center?

2. Did the division of assets involve a sale of Laband's stock to the corporation?

3. Was Laband entitled to recover all or part of his costs of relocating his office from 808 Cobb Medical Center to 707 Cobb Medical Center?

4. Was there a "goodwill" of significance attributable to the corporation separate and apart from the goodwill enjoyed by each of the physicians separately?

This action was initiated by Charles S. Fine and H. Stephen Epstein to dissolve and liquidate the practice and assets of Fine, Laband & Epstein, P.S. (FLE Corp.), a professional service corporation. Fine, Laband and Epstein, who practiced obstetrics and gynecology, were equal one–third shareholders in FLE Corp. After irreconcilable differences, they decided to dissolve FLE Corp. with the intent to reorganize into two separate corporations: Fine & Epstein, P.S., and Manfred Laband, M.D., P.S.

A shareholders agreement (Shareholders Agreement) dated December 29, 1979, settled most of the issues surrounding the corporate dissolution. Among other things, the parties agreed that Fine & Epstein, P.S., would occupy FLE Corp.'s old offices at 808 Cobb Medical Center (808 Cobb). Laband obtained bare office space at 707 Cobb Medical Center (707 Cobb), which had to be remodeled to fit his needs for his practice. As a result, Laband could not vacate 808 Cobb until December 30, 1980.

The parties could not agree on the amount, if any, due Laband for his agreement to move from 808 Cobb, and stipulated that remaining issues would be settled by litigation. The Shareholders Agreement provided in part as follows:

> 5.3 *Future Determination of Compensation.* The parties have been unable to agree on the amount of monetary compensation, if any, due Laband and the Laband Corporation by reason of the undertakings to discontinue

medical practice, at the 808 Cobb Medical Building office location, to move from such office location . . . and to authorize the distribution . . . to F–E Corporation, of the rights in the leasehold and leasehold improvements and in the office location established and associated with the parties' obstetric and gynecological practices. Nevertheless, the parties have determined that it is in the best interests of the Corporation and its patients, to carry out the divisive reorganization and to distribute the assets of the practices in redemption of the stock in the Corporation on the effective date despite their inability to reach agreement concerning such compensation. They elect to leave the entitlement of Laband and Laband Corporation and a possible extension of joint occupancy and the sublease . . . as the only remaining issues for future determination in the litigation presently pending between them in the case captioned *Fine v. Laband,* King County Cause No. 79–2–04263–3. Each party, and their respective newly formed corporations, shall not be foreclosed by this Agreement from offering evidence on, and arguing their respective theories concerning, the amount, if any, due Laband and Laband Corporation for agreeing (a) to relinquish, and to allow the other parties and F–E Corporation to acquire, jointly owned rights distributed in the reorganization and particularly the rights to the office at 808 Cobb Medical Center, and its associated fixtures and improvements, and (b) incur the risks and costs, if any, associated with the relocation of the medical practice to a different location in the time and manner as specified . . .

Laband contends that included in "leasehold improvements" and "fixtures" for which he claims a right to reimbursement, are any and all items now erected, fabricated, built, installed or constructed in the medical offices and laboratory in the Cobb Building occupied by the Corporation and not listed on Attachment 1, including but not limited to machinery, fixtures, partitions, built–ins, cabinetry, carpeting, window coverings and drapes, whether paid for directly by the Corporation or amortized in past or current leases where improvement costs were to be borne by the landlord.

Fine and Epstein contend that Laband is not entitled to compensation for any of the foregoing items.

. . .

8.1 *Termination of Prior Agreements.* Upon the division of the Corporation as provided for in this Agreement, the parties shall waive and relinquish and shall join with the Corporation in terminating any and all employment and other agreements between the Corporation and the parties, or between the parties, except as may be incorporated into this Agreement and the agreements which will implement it. The parties shall cause their respective counsel to file a written stipulation in King County Cause No. 79-2-04263-3 reflecting the terms of this agreement.

Laband asserted that the value of his shareholder interest in the lease of 808 Cobb included all the fixtures and improvements in 808 Cobb "including but not limited to machinery, fixtures, partitions, built-ins, cabinetry, carpeting, window coverings and drapes." Fine and Epstein did not feel that Laband was entitled to any of the above recited items. Fine and Epstein asserted that Laband was only entitled to depreciated book value of the lease since depreciated book value was the method used most often in prior agreements. On the other hand, Laband claimed that the 808 Cobb lease should be valued at its fair market price since (1) the Shareholders Agreement had terminated all prior agreements between FLE Corp. and the parties, except those agreements which were incorporated into the Shareholders Agreement; and/or (2) under statutory corporate law, he should receive the fair market value of one-third of the assets of the dissolved corporation.

The trial court agreed with Laband and found that the reproduction cost of the 808 Cobb office reduced by depreciation would be $174,312 as of December 31, 1979, and that since the lease of the premises had only 8 years and 3 months to run from December 31, 1980, the use value of the lease was $143,807. The trial court then found that the tenant of 808 Cobb had a "rent benefit" flowing from the right to use the fixtures and leasehold improvements for the term of the lease and granted a "rental differential" to Laband based upon the rental that Laband would pay in the 707 Cobb space, further finding that:

Under the market conditions which prevailed in December 31, 1979, an additional increment of fair market value was inherent in the leasehold for the 808 Cobb office and must be added to the use value of the improvements and fixtures. This additional increment is the rent differential, or lease benefit, inherent in the below market FLE Corp. lease. This differential, or benefit, will accrue to plaintiffs over the period from December 31, 1980 to March 31, 1989. The full rental differential between the fair market rental rate for basic, unimproved space and the rent payable under the lease for 808 Cobb office over the life of such lease will be $2.59 per square foot per year. However, in determining the amount of the rental differential, or benefit, associated with the below–market 808 Cobb office lease, the court chooses to follow the more conservative valuation method . . . which takes into consideration the fact that the rental rate of the Manfred Laband, M.D. lease for space on the seventh floor of the Cobb Medical Center is also below the fair market rental rate. The court compared the rental payable under the Manfred Laband M.D. lease with the rental payable under the 808 Cobb office lease for the eight year, three month period. The court adjusted this figure . . . to take into account the difference in space footage of the two offices. The resulting rental differential, and benefit, equals $40,861, which figure the court calculated the differential over a shorter eight year, three months period. Other than for the consideration given to the Manfred Laband M.D., P.S. lease in the foregoing calculation of rent benefit inherent in the below–market 808 Cobb office leasehold, no other credit or offset should be made for the fact that the rental rate payable under the Manfred Laband M.D., P.S. lease is also below the fair market rental rate.

Inflation and its expected impacts over the eight year, three month period require that the full amount of the rent differential or benefit should be included in the fair market value determination, without discounting to present value.

The trial court concluded that the appropriate measure of the value of the 808 Cobb leasehold was fair market value and not depreciated book value; that the fair market value of the 808 Cobb leasehold as of December 31, 1979

was $184,668 of which Laband was entitled to one–third; and rejected the depreciated book value formula on the ground that it was inappropriate to the facts. Fine and Epstein assign error in regard to those issues.

Laband cross–appeals and assigns error to the court's finding that he was not entitled to any award for his alleged loss of goodwill, and to the court's failure to award him damages for the costs he incurred in relocating from 808 Cobb to 707 Cobb.

The first issue is what was the proper legal way to evaluate the leasehold interest of Laband in the premises at 808 Cobb?

We first note that when findings of fact in reality pronounce legal conclusions, they may be treated as such. *Woodruff v. McClellan,* 95 Wn.2d 394, 622 P.2d 1268 (1980); *White v. Wilhelm,* 34 Wn. App. 763, 665 P.2d 407 (1983). Reaching the proper formula for evaluating the leasehold interest in the 808 Cobb premises requires ascertaining the correct legal formula and is not the statement of an ultimate fact.

We read paragraph 8.1 of the Shareholders Agreement as intending to preserve the existing understandings and agreements between the parties until the *completion* of "the division of the Corporation as provided for in this Agreement," and then to terminate those employment and other agreements not incorporated into the Shareholders Agreement. The provisions of the Pre–Incorporation Agreement of August 1976 and the Corporate Stock Purchase Agreement of February 1977 were intended to govern the relationships of the parties until the division of the FLE Corp. was finished. The division of the FLE Corp. could be accomplished pursuant to such guidelines as existed. We do not interpret the Shareholders Agreement as intending to create a vacuum in the relationships of the parties.

The leasehold interest held by the FLE Corp. in 808 Cobb was an asset of that corporation and subject to valuation under the previously existing Pre–Incorporation Agreement of 1976 and the Corporate Stock Purchase

Agreement of 1977. When the FLE Corp. was to be divided among the shareholders under the Shareholders Agreement, this division called for a redemption of each shareholder's interest according to existing and agreed upon guidelines and not according to a formula yet to be established.

The Pre–Incorporation Agreement of 1976 provided for the redemption of shares where this course was required by the professional corporation laws of the state of Washington, and stated in part:

REDEMPTION PRICE

3.4 The redemption price per share shall be the value of the corporation's assets, excluding accounts receivable and work in process, reduced by the corporation's liabilities, as reflected on the corporation's books and as determined in accordance with generally accepted accounting principles, divided by the number of shares issued and outstanding.

This theme was carried forth into the Corporate Stock Purchase Agreement of 1977 wherein it was stated:

3. *Compulsory Sale of Stock Upon Breach.* Upon the termination of an employment contract with the Corporation by reason of the employee's breach of the employment contract, and in all instances where redemption is required by the professional corporation laws of the State of Washington, regardless of the terms of the employment contract, the Corporation shall redeem, or if it cannot legally do so, the remaining stockholders shall purchase, and the terminating stockholder shall sell his shares in the Corporation at the price set forth in paragraph 4 and on the terms set forth in subparagraph 5(c).

4. *Sales Price.* The sale price per share shall be the value of the Corporation's assets, excluding accounts receivable and work in process, reduced by the Corporation's liabilities, as reflected on the Corporation's books on the day prior to the event resulting in the sale of said stock, as determined in accordance with generally accepted accounting principles, divided by the number of shares issued and outstanding.

These provisions must control the valuation of the assets of the FLE Corp. The leasehold at 808 Cobb was one of its primary assets.

■ Further, it would be inconsistent and unfair to permit any of the shareholders to acquire an interest in the corporation under one formula and relinquish it under another. The desire of the parties as expressed in the Shareholders Agreement was to divide the corporation among the shareholders. The words "divide the Corporation" is the term used in the Shareholders Agreement and must refer to all of the assets of the corporation, whether specifically covered in that agreement or not. It is important to remember that Dr. Fine had begun this medical practice in 1941, and Dr. Laband associated with him in 1959; Epstein joined them as an associate in 1974, and the FLE Corp. was formed in 1976. The Pre–Incorporation Agreement granted stock to each new stockholder in accordance with the depreciated book value of their capital contributions, and Epstein purchased his shareholder's interest by contributing cash in the amount the depreciated book value of his capital interest exceeded that of the assets he contributed. As set forth in the Agreement, this formula was to be followed in the event of withdrawal of any shareholder, and depreciated book value was to be the price fixed for purchase of a shareholder's capital interest. Thus, the use of the depreciated book value method, either upon entering into the corporation or departing it, was the agreed upon formula for valuing corporate assets.

In *Jones v. Harris,* 63 Wn.2d 559, 562, 388 P.2d 539 (1964), a contest arose over valuation of a shareholder's interest. The opinion states:

But whether the parties reasonably should have anticipated that book value would not approximate the true value of the corporations, nevertheless, book value was the basic ingredient of the formula they chose to determine the "buy–out" price. . . . The contract cannot be said to have been unfair or inequitable *when it was made,* and now is too clear to admit of interpretation to include and emphasize equities, non–existent at the inception of the contract, but which have evolved and now seem persuasive. Many close corporations have similar buy–out provisions, and the courts would do a disser-

vice to business practice by substituting an "appraisal" or "market value" formula when hindsight shows that "book value," as originally conceived, has become unrealistic with the passing of time.

The courts, of course, are not bound irrevocably to a single definition of "book value." But, when a term that has a generally accepted meaning is used, the parties are hard pressed afterward to claim their intent was otherwise. "Book value" normally means the value of the corporation as shown on the books of account of that corporation, after subtracting liabilities. *Schaffer v. Below,* 278 F. (2d) 619 (3d Cir. 1960). In such cases courts should accept the book accounts, when they are kept in accord with accepted accounting practice and not with an eye to the advantageous exercise of the "buy-out" option.

Similarly in *Berg v. Settle,* 70 Wn.2d 864, 425 P.2d 635 (1967), the court held to the method of evaluating the interest of partners that they had agreed upon previously.

Finally, we find no justification for comparing "rental benefits" and "rental differential" of the leasehold remaining of 808 Cobb with the leasehold of 707 Cobb following the dissolution of the FLE Corp. The proper approach to valuation of the leasehold at 808 Cobb was its worth to the corporation under the existing agreements of the stockholders—to wit, depreciated book value. In that way each stockholder acquired the same interest dependent upon the value of the corporation at the time of dissolution. Valuation could not be dependent upon the "rent benefit" of the 808 Cobb leasehold to the remaining individuals and the valuation of the 808 Cobb leasehold certainly could not be dependent upon or related to a separate leasehold at another location acquired by a departing stockholder. The question before us is one of law, not of equity, and the issue as stated by the trial court was how to establish Laband's share of the value of the 808 Cobb leasehold under the written agreement of December 29, 1979, "under which FLE Corp. was to be divided between them."

Laband is entitled to be reimbursed for his shareholder's interest in the 808 Cobb lease at the depreciated book value

of that asset of the corporation.

Did the division of assets involve a sale of Laband's stock to the corporation?

Redemption arises out of a contract between a corporation and its shareholders whereby the corporation agrees to repurchase shares under terms agreed upon by the parties and set forth in the articles. *Miller v. Magline, Inc.,* 105 Mich. App. 413, 306 N.W.2d 533 (1981); *see also* 11 W. Fletcher, *Private Corporations* §§ 5308–12, at 580–97 (1971).

The Shareholders Agreement recognized that all parties contemplated a redemption of the stock of FLE Corp., and then a contribution of these assets to new professional service corporations to be set up for Fine and Epstein and for Laband. The Shareholders Agreement stated:

> A.5 The shareholders shall instead accomplish the substance of the reorganization described in A.4 above, and intend to qualify under the Internal Revenue Code Sections cited in A.3 above, by receiving the distributed assets of the practices in full redemption of their stock in Fine, Laband & Epstein, P.S., on the condition that these assets be immediately and simultaneously contributed in exchange for shares of separate professional service corporations formed for the purpose of continuing the incorporated practices.

Section 5.3 of the Shareholders Agreement carried through the reorganization plan by way of a sale of the FLE Corp. stock (a redemption or repurchase by the corporation) back to FLE Corp. and then redistribution of the stock's value to the new corporations in a tax–free exchange. Such a transaction called for valuation under the written agreements.

Was Laband entitled to recover all or part of his costs of relocating his office from 808 Cobb to 707 Cobb?

There is no showing that the parties ever agreed to do anything but divide the assets of the corporation. Any additional costs incurred by Laband for relocating were not a part of the assets of the corporation. We can discover no legal basis to support any claim for relocation costs. When

the parties split up, each was on his own to assume such costs as might be incurred from that moment on. Fine and Epstein were not entitled to any cost they might incur for remodeling the premises at 808 Cobb, and Laband was not entitled to any costs he might incur for moving to 707 Cobb. We affirm the holding that relocation costs were not a recoverable item.

Was there a "goodwill" of significance attributable to the corporation separate and apart from the goodwill enjoyed by each of the physicians separately?

■ The valuation of goodwill is a question of fact to be resolved by the trial court. *Suther v. Suther,* 28 Wn. App. 838, 844, 627 P.2d 110 (1981). The evidence supports the findings of the trial court on this issue. Here, when the assets of the corporation were divided among the three shareholders, each one took his own patient files and continued his practice in his own name. A patient calling the phone number of FLE Corp. would reach an exchange which referred to each doctor's new individual phone number. Each physician had been listed previously under his individual name, and there had been no listing for FLE Corp. in the telephone directory.

In *Harstad v. Metcalf,* 56 Wn.2d 239, 351 P.2d 1037 (1960), where a civil and electrical engineer divided their partnership, the court held that no goodwill continued after a division of the assets of the partnership and that neither partner was entitled to compensation for goodwill accruing to the other's business. *See also Kalez v. Miller,* 20 Wn.2d 362, 147 P.2d 506 (1944).

Here each of the physicians are continuing their own practices in the same building they have practiced in for years. The evidence supports the finding that the patients of each doctor would remain the patients of the doctor that had treated them previously. The evidence supports the finding that "goodwill" as it existed flowed to each individually. The goodwill that existed toward the three doctors flowed toward the three as a group, was shared equally by each, and was not enjoyed by the corporation. We affirm

the trial court's finding that goodwill did not exist as an ascertainable asset to be counted for in the distribution of assets.

The trial court is affirmed in part and reversed in part.

The findings of the trial court as to the absence of appreciable goodwill and the absence of a right to recover relocation costs are supported by substantial evidence and are affirmed. The findings and conclusions of the trial court concerning the evaluation of the remaining leasehold interest are reversed.

The depreciated book value of the leasehold improvements was $2,358. This is an asset of the FLE Corp. and Laband is entitled to one–third thereof, to wit $786. During the period the three physicians shared 808 Cobb from the time of the FLE dissolution until Laband moved to 707 Cobb, Laband should reimburse Fine and Epstein for his share of costs incurred. These costs were $2,600.84. Fine and Epstein are entitled to judgment for $2,600.84 less $786, to wit, in the sum of $1,814.84.

ANDERSEN, C.J., and SCHOLFIELD, J., concur.

Reconsideration denied August 23, 1983.