[No. 10661-9-I.   Division One.   August 13, 1984.]

THE BANK OF WASHINGTON, *Appellant,* v. LEROY
BURGRAFF, ET AL, *Respondents.*

*Craig P. Hayes,* for appellant.

*George Livesey,* pro se, and *James A. Wynstra,* for re-
spondents.

SWANSON, J.—The Bank of Washington appeals a Whatcom County Superior Court judgment contending that the trial court erroneously set the priority and value of conflicting security interests in the proceeds from the sale of a Bellingham restaurant.

In 1972, the Lehmanns, as lessors, and the Burgraffs, as lessees, entered into a 5-year lease commencing on January 1, 1973, to permit the Burgraffs to continue to conduct their restaurant business known as the Forbidden Inn. The lease granted the Burgraffs the option to extend the lease to 1983 under the same terms.

In 1973, the Burgraffs sold their interests in the Forbidden Inn to Daniel and Antonina Madeja pursuant to a purchase money security agreement. The Burgraff–Madeja agreement allocated the $70,000 purchase price as follows:

| | |
|---|---:|
| Equipment and fixtures | $20,000 |
| Goodwill | 44,000 |
| Noncompetition covenant | 1,000 |
| Inventory and supplies | 5,000 |
| Total | $70,000 |

The Burgraffs also assigned their lessee's interests in the lease to the Madejas, but, as the trial court found, retained their rights under the lease in the event the Madejas defaulted.

In May 1976, the Madejas sold their interests in the Forbidden Inn to Johnnie and Andrea Empleo pursuant to a purchase money security agreement for $60,000, allocated as follows:

| | |
|---|---:|
| Equipment and fixtures | $20,000 |
| Goodwill | 34,000 |
| Noncompetition clause | 1,000 |
| Inventory and supplies | 5,000 |
| Total | $60,000 |

The Madejas additionally assigned to the Empleos their lessees' interests in the original Lehmann–Burgraff lease. At that time, the Madejas also assigned their interests in

the Madeja–Empleo agreement to the Burgraffs in full satisfaction of their debt to the Burgraffs due under the Burgraff–Madeja agreement.

The third party defendant, Mr. Livesey, was the attorney who handled the sales agreements for the Burgraffs and Madejas. He admitted his failure to file the statements required to perfect the Burgraffs' interest under the purchase money security agreements and admitted his legal responsibility to the Burgraffs for any loss they might incur thereby.

Empleo commenced operation of the business. On September 20, 1977, he executed a promissory note, security agreement, and financing statement in favor of the Bank of Washington in exchange for a $16,000 loan. Both the security agreement and the financing statement, which the Bank filed with the Department of Licensing, specified certain property as security for the loan. The security agreement also provided that the specified property secured all present and future advances which the Bank might make to Empleo.

Empleo also maintained a business checking account at the Bank of Washington. From September 1977 through February 1978, the Bank permitted Empleo to accumulate $44,000 in overdrafts. On February 4, 1978, Empleo executed in favor of the Bank a promissory note payable on demand to cover the overdrafts.

On January 20, 1978, 20 days after the initial, 5-year term of the original Lehmann–Burgraff lease had expired, Dyck and Woodward, who had purchased the Lehmanns' lessors' interests, and Empleo executed a new 5-year lease with a beginning date of January 1, 1978.[1] Additionally, this lease authorized the lessee to extend the lease for an additional 5-year term. The rent was increased from $425 per month, which was due under the Lehmann–Burgraff lease, to $1,000 per month. The Burgraffs were not signa-

---

[1]The 1973 original Lehmann–Burgraff lease also contained a 5-year renewal option.

tories to the new lease. The new lease, however, contained the following provision recognizing the Burgraffs' interests in it:

This Lease is an extension and modification of an original Lease entered into by Edward F. Lehmann and Ruth P. Lehmann, his wife, as Lessor and Leroy Burgraff, as Lessee, dated as of the 4th day of December, 1972, which Lessee's interest has been assigned by Leroy Burgraff to Daniel Madeja and Antonina Madeja, his wife, by Assignment of Lease dated the 23rd day of October, 1973 with the approval of the then Lessor, and which lessee's interest was thereafter assigned by the Madejas to the present Lessee, E. Johnnie Empleo and Andrea H. Empleo, his wife, by Assignment dated May 24, 1976 and thereat approved by the then Lessors. It is understood that the said consecutive Lessees are entitled to rely on the Lessee's interest in this Lease as a part of their security pursuant to any outstanding Purchase Money Security Agreement pertaining to the business known as "Forbidden Inn" located on said premises.

In an unchallenged finding of fact, the trial court stated in part:

That Burgraffs were not a party to the new lease nor had they surrendered their lease rights to the premises by virtue of the lease they had with Lehmann referred to in Paragraph III of these Findings, . . .

Finding of fact 7.

The Empleos defaulted on the notes in early 1979, owing over $40,000 plus interest, abandoned the business in March of 1979, and skipped town. Thereafter, Burgraff entered the premises, changed the locks on the doors, and continued to make lease payments to Dyck and Woodward, successors to Lehmann, for a period of 3 months while arranging for the sale of the restaurant to John and Milagross Dumatol for $57,000 in June of 1979. The sales contract did not itemize the purchase price, as did the Burgraff–Madeja and Madeja–Empleo contracts. The court found, however, that the value of the physical assets was $6,000; also, the evidence established that there were few, if any, supplies and inventory, and that there was no value to

the liquor license, which the Washington State Liquor Control Board had placed in the "discontinued" category after Empleo had abandoned the restaurant.

On July 2, 1979, Dyck and Woodward executed another lease with Burgraff and Dumatol as lessees for a term of 3 years at $1,000 per month. The lease also contained an option to renew the lease for 3 more years under the same terms.

Before the sale to the Dumatols, the Bank notified the Burgraffs that they claimed an interest in the restaurant. The Bank agreed, however, to permit the sale to proceed and to resolve their conflicting interests thereafter. Not having resolved the conflict by September 4, 1979, the Bank filed suit to foreclose on its security interest. It claimed that it had a security interest in the $57,000 proceeds from the sale of the restaurant to the Dumatols prior and superior to the security interest held by the Burgraffs.

The trial court entered these critical findings of fact to which the appellants assign error:

### XIII.

That under the Security Agreement and Financing Statement the only asset that Plaintiff could look to is the equipment as Plaintiff had no lease rights; the business had been abandoned by its debtor, Empleo; the Class "H" license had been picked up and put in the "Discontinued" category because of abandonment of the premises; there was no going business. That Plaintiff offered no testimony as to values of any of the assets it claims. The only evidence of value was that given by Defendant Burgraff as to the value of the equipment if removed from the premises and the figure was $6,000.00. The Court finds that $6,000.00 is a reasonable figure to be placed as a value of the equipment and that is the only asset that Empleo had which the Plaintiff could look to under its Security Agreement.

### XVI.

The Court further finds that the term "general intangibles" as used in both the Bank of Washington Security Agreement and Financing Statement, both dated September 22, 1977, refer back to the terms "and all proceeds of debtor's inventory". The Court thus finds that

the instruments secure inventory and fixtures and the "proceeds" thereof, including the terms particularly specified in such instruments, among them "general intangibles". General intangibles is not a separate item covered and secured by the instruments in and of themselves.

The trial court then entered these conclusions of law:

I.

That Plaintiff has a superior right only to the equipment as it was the only asset that Empleo had when he abandoned the Forbidden Inn. That Plaintiff agreed to look only to the value of any asset that it had a superior right to and that value is $6,000.00.

II.

That Plaintiff is also entitled to its cost, disbursement and attorney's fees in the amount of $3,994.30 which the Court finds to be reasonable.

III.

That Plaintiff's right to the proceeds of the Burgraff–Dumatol contract are superior only to the amount of $6,000.00 plus $3,994.30 or a total of $9,994.30 which are to be taken from the downpayment and accumulated monthly payments and the balance is to be turned over to Defendants.

IV.

That based on the stipulation of Third Party Defendants, the Defendants Burgraff are entitled to Judgment over against the said Third Party Defendants for any monies paid from the Burgraff–Dumatol sale proceeds as detailed in Paragraph III of these Conclusions of Law, as well as for their taxable costs.

In summary the trial court ruled that, as between the Bank of Washington and the Burgraffs, the Bank had a prior security interest only with respect to the equipment, valued at $6,000, and with respect to reasonable legal fees ($3,994.30) necessarily incurred to foreclose on that interest (total of $9,994.30). In addition, the court ruled that the Burgraffs had a prior interest in the balance and had a right to have Livesey reimburse them for the $9,994.30 lost to the Bank due to Livesey's failure to properly file the statements necessary to perfect the Burgraffs' security interest.

■ Initially, our attention is drawn to the language found in the Bank's financing statement and security agreement. They state that the following property secured the loans:

> All inventory, equipment and fixtures including but not limited to Restaurant fixtures, equipment and inventory of Debtor, now or hereafter owned by debtor in his business as Johnnie's Forbidden Inn and all proceeds of debtor's inventory in any form or forms, accounts, contract rights, chattel paper, *general intangibles,* instruments or other rights to payment, now and hereafter arising out of business of Debtor.

(Italics ours.) We disagree with the trial court's interpretation of this language that "general intangibles" is not a separate item securing the debt. The term "general intangibles" is not a type of "proceeds of debtor's inventory." Rather, the property securing the debts includes, in addition to proceeds of debtor's inventory, those items thereafter listed, *e.g.,* accounts, contract rights, chattel paper, and general intangibles. Therefore the Bank received a security interest in the "general intangibles" of the restaurant. RCW 62A.9–106 (1976) defines "general intangibles" as follows:

> any personal property (including things in action) other than goods, accounts, contract rights, chattel paper, documents and instruments.

The official comments to RCW 62A.9–106 state in part:

> The term "general intangibles" brings under this Article miscellaneous types of contractual rights and other personal property which are used or may become customarily used as commercial security. Examples are goodwill, literary rights and rights to performance.

Appellant then argues that both the Bank and Empleo contemplated that all the restaurant business including the goodwill and leasehold interests were being put up as collateral to assure the repayment of the obligation to the Bank. From this appellant argues that, because Dumatol purchased the restaurant business for $57,000 and the equipment was valued at only $6,000, the goodwill of the

business had a value of up to $51,000.

On the other hand, the respondents have maintained throughout this appeal that goodwill in a restaurant cannot exist apart from the right to enter and occupy the premises. Because the Bank had no leasehold rights, respondents thus conclude that the Bank could not realize any security interest in general intangibles, assuming general intangibles includes goodwill.

■ We believe, however, that goodwill, the valuation of which is a question properly submitted to the trier of fact, *Fine v. Laband,* 35 Wn. App. 368, 379, 667 P.2d 101 (1983), is an intangible and valuable asset which can exist independently from leasehold rights. The Supreme Court has defined goodwill to mean

> every positive advantage that has been acquired by the old firm in the progress of its business, whether connected with the premises in which the business was previously carried on, *or* with the name of the late firm, *or* with any other matter carrying with it the benefit of the business.

(Italics ours.) *Menendez v. Holt,* 128 U.S. 514, 522, 32 L. Ed. 526, 9 S. Ct. 143 (1888).

■ Goodwill, however, cannot exist where the business is not a going concern.

> The good will of a going business is an element which inheres in it and cannot be separated from the whole. *Stanton v. Zercher,* 101 Wash. 383, 172 Pac. 559 (1918). There are many elements, defined in the decisions of this court and other jurisdictions, which comprise good will. Among these are continuity of name, location, reputation for honesty and fair dealing, individual talents and ability of the members of the going business organization, and many others. *J. L. Cooper & Co. v. Anchor Securities Co.,* 9 Wn. (2d) 45, 113 P. (2d) 845 (1941). Good will is an intangible element that inheres in the value of a going business.

*In re Estate of Glant,* 57 Wn.2d 309, 312, 356 P.2d 707 (1960). Here, the trial court found as a fact:

> Plaintiff had no lease rights; the business had been abandoned by its debtor, Empleo; the Class "H" license

had been picked up and put in the "Discontinued" category because of abandonment of the premises; there was no going business. That Plaintiff offered no testimony as to values of any of the assets it claims.

Finding of fact 13.

On this record, which supports the trial court's finding that there was no going business at the time of the sale and that the Bank had no interest in the lease, whereas Burgraff did,[2] there was no goodwill upon which the Bank could realize its interests. As the cases make plain, goodwill is inextricably included in a going business and cannot be separated from it. Here Empleo had abandoned both the going business and the lease. Only the equipment remained. Consequently, any goodwill that might have existed previously was abandoned along with the abandonment of the lease and the restaurant business.

Moreover, if the Bank believed goodwill had a value in this context, it was the Bank's obligation and burden to present testimony establishing such fact. The Bank failed to do so. It cannot now complain.

■ The respondents raise the last issue: Is the Bank entitled to receive a priority interest in the proceeds equal to the cost of their attorney's fees incurred at trial? Because both respondents failed to assign error to the trial court's conclusion granting the Bank such a priority interest, this issue is not properly before this court and will not be considered. RAP 10.3(b).

---

[2]Although the Burgraffs were not signatories to the Dyck–Woodward–Empleo lease, such status is not always a prerequisite to the establishment of contractual rights.

A third party may enforce a contract to which he is not in privity . . . if it is made to appear that the contracting parties intended to "secure to him personally the benefits of the provisions of the contract."

(Citation omitted.) *Layrite Concrete Prods. of Kennewick, Inc. v. H. Halvorson, Inc.*, 68 Wn.2d 70, 72, 411 P.2d 405 (1966). Construing the written lease, and particularly the clause quoted in the text of this opinion at page 495, in the light of the surrounding circumstances, *Wolfe v. Morgan*, 11 Wn. App. 738, 524 P.2d 927 (1974), we conclude that the Burgraffs possessed the right as third party beneficiaries under the Dyck–Woodward–Empleo lease to reenter the premises as lessees.

Accordingly, the trial court's judgment is affirmed.

Ringold and Scholfield, JJ., concur.