[No. 27008-7-I.   Division One.   September 9, 1991.]

ROGER C. WALSH, *Respondent*, v. ROBERT L. BROUSSEAU, ET AL, *Appellants*.

740

*James U. Bittner* and *Kasperson & Bittner, P.S.,* for appellants.

*Robert J. Rohan* and *Schweppe, Krug & Tausend P.S.,* for respondent.

COLEMAN, J. — Robert and Jan Brousseau appeal the order granting Roger Walsh's motion for summary judgment, arguing that the trial court erroneously (1) granted the motion for summary judgment when there was a genuine issue of material fact, (2) held that the contract was enforceable, and (3) ordered payments under the promissory note to be accelerated. We affirm.

After 32 years of practicing law, Roger Walsh decided to retire. In the summer of 1978, he began negotiating with one of his associates, Robert Brousseau, regarding the sale of his practice. Eventually, they executed an agreement under which, for $125,000, Walsh sold Brousseau his business assets, including "the good will of the business as a going concern, together with all fixtures, furniture, equipment, library, accounts, files, office supplies and stationery[.]" Walsh also sold Brousseau his office and trust accounts and accounts receivable for $62,819.67. The Brousseaus signed two promissory notes obligating them to payments totaling $2,281.56 per month.

In 1981, after buying Walsh's practice, Brousseau netted approximately $212,000, compared to the $22,000 he

earned in 1978 while still an associate of Walsh. By 1986, however, Brousseau fell behind in his monthly payments to Walsh. Walsh agreed to reduce Brousseau's monthly payment to $1,000 per month. The parties executed an amendment to the original sale agreement, and the Brousseaus signed a new promissory note for $89,811.04, which was the total amount owing under the original two promissory notes. Brousseau also agreed to pay Walsh's future bar association dues and his medical insurance premiums during the life of the agreement.

Brousseau fell behind in his payments again in 1988. In March 1989, Brousseau told Walsh that he did not intend to make any more payments. Furthermore, Brousseau claimed that the agreement for the sale of goodwill of Walsh's law practice was unenforceable.

In January 1989 Walsh filed a complaint against the Brousseaus for the money, including interest, due under the original two promissory notes or, in the alternative, the money due under the substitute note. Walsh also asked for sums equal to his medical insurance premiums and bar association dues for life. Finally, he asked to recover his accounting fees and costs, attorney fees and costs, and any other relief the court deemed just and equitable.

On July 19, 1990, Walsh moved for summary judgment. After arguments were heard on August 9, 1990, the trial court granted his motion. The Brousseaus were ordered to pay $55,069.79 as principal, $1,710 in interest to the date of the judgment (the statutory rate of interest after the judgment), $2,701 in attorney fees, and $322.91 in costs. On August 15, 1990, the Brousseaus moved for reconsideration of the order of summary judgment. The motion was denied on August 29, 1990. This appeal followed.

We first consider whether there was a genuine issue of material fact that should have precluded the trial court's order granting Walsh's motion for summary judgment.

Brousseau argues that there is a dispute of fact regarding whether or not goodwill was an item of sale in the

purchase and sale agreement. He refers to Walsh's motion for summary judgment in which it was stated that

> Walsh and Brousseau had never discussed good will as a part of the sale of the assets of the law practice. Their accountants had discussed it as part of the tax considerations of the sale, and Brousseau's accountant had suggested how much of the sales price was allocated to good will.

There is no question, however, that goodwill was an item included in the sale: numerous references are made to goodwill in the agreement. Rather, the issue is whether the sale of goodwill under the contract was a violation of public policy that rendered the contract unenforceable. Therefore, there is no genuine issue of material fact that should have precluded summary judgment.[1]

Next, we consider whether the contract for the sale of the goodwill of Walsh's law practice violated public policy and, therefore, whether it was unenforceable.

Under the Rules of Professional Conduct,

> [a] lawyer shall not give anything of value to a person for recommending the lawyer's services, except that a lawyer may pay the reasonable cost of advertising or written communication permitted by this rule and may pay the usual charges of a not-for-profit lawyer referral service or other legal service organization.

RPC 7.2(c). In 1979, when the agreement between Brousseau and Walsh was entered, the related rule was as follows:

> Except as permitted under CPR DR 2-103(C), a lawyer shall not compensate or give anything of value to a person or organization to recommend or secure his employment by a client, or as a reward for having made a recommendation resulting in his employment by a client.

---

[1]Brousseau also assigns error to the fact that the trial court considered parol evidence in reaching its decision. He argues that parol evidence was not admissible on the issue of whether or not goodwill was an item of the sale. Whether parol evidence was considered is immaterial, however, because there is no question that goodwill was an item included in the sale. Furthermore, Walsh agreed for the purposes of this appeal to allow this court to base its decision solely upon the parties' agreements, the undisputed facts, and the law. This court, therefore, need not consider whether or not parol evidence properly was considered.

CPR DR 2-103(B). In 1990 the House of Delegates of the American Bar Association adopted a rule allowing a lawyer or law firm to sell or purchase a law practice, including goodwill, under certain conditions including written notice to each of the seller's clients. The Washington Supreme Court has not yet adopted an analogous rule.

Few courts have addressed the validity of a contract for sale of goodwill of a law practice. *See* Annot., *Validity of Contract for Sale of "Good Will" of Law Practice*, 79 A.L.R.3d 1243, 1245 (1977). The leading case is *Geffen v. Moss*, 53 Cal. App. 3d 215, 125 Cal. Rptr. 687, 79 A.L.R.3d 1232 (1975). Ralph Geffen, an attorney who had been appointed to serve as a United States magistrate, entered into a written agreement with another attorney, Russell Moss. Under the agreement, "Geffen agreed to sell and Moss to buy 'the physical assets, files and work in process' of Geffen's law practice." *Geffen,* at 217. Subject to approval by the respective clients, the purchase included "all cases and legal matters now pending in the above law practice except personal injury or wrongful death cases[.]" *Geffen*, at 218. The agreement also contained a clause stating that "Geffen expresses an intention to exert his influence for the continued welfare of the practice and to encourage present and former clients to utilize the legal services of the office in the future." *Geffen*, at 219. The parties did not use the term "goodwill" in the agreement.

No specific statute or California case compelled the *Geffen* court to hold that a purported sale of goodwill was contrary to public policy and therefore illegal. The Rules of Professional Conduct of the State Bar of California, however, prohibited "solicitation or obtaining of professional employment by any means of communication." *Geffen*, at 225. The rules also prohibited an attorney from paying another for soliciting or obtaining employment for him. *Geffen*, at 226.

The *Geffen* court considered the policy reasons against the sale of goodwill of a law practice. First, there is a danger that someone who is to be remunerated for refer-

ring clients to a particular attorney will not refer the client to the most competent attorney, but rather to the attorney who is compensating him. *Geffen*, at 226. Second, the relationship between attorneys and their clients is of a personal and confidential nature. *Geffen*, at 226. The relationship is not one that can be likened to that of a merchant and customer. *Geffen*, at 226. Considering these policy reasons behind the California Rules of Professional Conduct, the *Geffen* court held that

> [t]he attempted sale of the expectation of future patronage by former and current clients of a law office coupled with an agreement to encourage said clients to continue to patronize the purchaser of the physical assets of the office, under the facts of this case, may well be said to constitute an attempt to buy and sell the good will of a law practice as a going business, contrary to public policy, and that the portion of the agreement purporting to so do is invalid and unenforceable.[2]

*Geffen*, at 226.

The agreement between Brousseau and Walsh stated that Walsh would "continue to make a positive effort to procure and assist in continuing business of the office" and, during the life of the agreement, would not "directly or indirectly, induce any of his former clients . . . to patronize any other attorney or law firm other than the Purchaser." Additionally, Walsh agreed that

> [if] requested by Purchaser [Brousseau], Seller shall introduce Purchaser to all clients, and other parties with whom Seller does business. Seller also agrees to make himself available in the future for reasonable consultation regarding clientele of the practice, both future and past.

The language of the agreement is ambiguous. However, to the extent that one could infer a duty to refer clients as part of the consideration for the sale, based upon the language that Walsh would "continue to make a positive

---

[2]Only one Washington case was found that addresses the issue of the sale of goodwill of a law practice, and it does so only in dicta. *See Koehler v. Wales*, 16 Wn. App. 304, 556 P.2d 233 (1976). The *Koehler* court noted that "[a] lawyer has no proprietary interest in former clients." *Koehler*, at 311 (citing *Geffen*). The court then quoted the holding in *Geffen*. *See Koehler*, at 311-12.

effort to procure and assist in continuing business of the office", the agreement violates the Rules of Professional Conduct in Washington in their present form. Our inquiry, however, does not end there. We must next consider whether the parties were in pari delicto. *See Golberg v. Sanglier*, 96 Wn.2d 874, 639 P.2d 1347, 647 P.2d 489 (1982).

■ The general rule of in pari delicto is that when the parties are of equal guilt, the defendant will prevail. *Golberg*, at 882. However, "[w]here the conduct of the party who seeks to enlist support of the doctrine outrages public sensibilities more than the conduct of the party against whom the doctrine is sought to be applied, courts will not support application of the rule." *Golberg*, at 883.

The decision whether a party is in pari delicto is based upon policy considerations. *Golberg*, at 883. Of key concern is whether the court's decision will be likely to prevent the illegal transactions at issue from occurring in the future. *Golberg*, at 883.

> Where, by applying the rule, the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied.

*Golberg*, at 884 (quoting *Tri-Q, Inc. v. Sta-Hi Corp.*, 63 Cal. 2d 199, 218-19, 404 P.2d 486, 45 Cal. Rptr. 878 (1965)). The best way to effectuate the rule, therefore, may be to enforce the plaintiff's claim rather than to leave the defendant in possession of the benefit. *Golberg*, at 884.

In *Golberg*, the petitioners had received an award of damages from the trial court based upon its finding that they had been the victims of a fraudulent sale of their interests in a partnership agreement with the respondents. The Court of Appeals reversed the decision after finding that the partnership agreement was illegal and unenforceable. The Supreme Court agreed with the Court

of Appeals that the partnership agreement was unlawful; however, it went on to consider whether the parties were in pari delicto. *Golberg*, at 882. It found that there was substantial evidence in the record to support the trial court's finding that the petitioners were not in pari delicto. *Golberg*, at 886. Then, because one of the respondents had been unjustly enriched, the court found that to allow the petitioners to recover only the value of their investments would be inequitable and an inadequate remedy. *Golberg*, at 887. The court, therefore, upheld the trial court's award to the petitioners of their share of the fair market value of the partnership. *Golberg*, at 887-88.

In this case, as in *Golberg*, the parties are not in pari delicto. Although it is true that neither party intended to enter an illegal contract, it is significant that Brousseau's own lawyer drafted the agreement. Even more significant is that Brousseau waited until he had reaped the full benefit of the bargain and then attempted to avoid its burdens by claiming that the agreement was illegal. By reaping the full benefit of the bargain, then repudiating the contract, Brousseau's behavior is the type of conduct that evokes public outrage. *See Golberg*, at 883.

In this case, policy goals can best be achieved by enforcing the agreement. Applying the rule of in pari delicto would not protect the public because the agreement already has been completed. Furthermore, there is no evidence in this case that any clients were harmed by the agreement between Walsh and Brousseau. While no serious moral turpitude is involved, Brousseau is guilty of the greater moral fault. Therefore, he should not be allowed to be unjustly enriched at Walsh's expense.[3] *See Golberg*, at 884.

---

[3]Brousseau argues that *Golberg* applies only in cases in which there has been unjust enrichment and one party is asking the other to "disgorge" payments already paid. Nothing in the *Golberg* opinion, however, indicates that its holding applies only when one party is asking the other to disgorge payments or profits. The *Golberg* court required the respondents to disgorge profits that accrued to them from their improper behavior because that was what was necessary to prevent them from being unjustly enriched. *See Golberg*, at 888.

■ Brousseau next argues that the trial court improperly awarded Walsh the entire amount owing under the promissory note, rather than only those installments that were owing at the time the action was commenced. However, when a party to a contract repudiates the contract, a court may award both past and future damages. *McFerran v. Heroux*, 44 Wn.2d 631, 640, 269 P.2d 815 (1954); *see also* 11 S. Williston, *Contracts* § 1315 (3d ed. 1968). Brousseau repudiated the contract in this case. The trial court, therefore, did not err when it awarded Walsh the entire amount owing under the agreement.

■ Walsh argues that the trial court erroneously failed to award him $940 for his accounting fees and costs. In the agreement between the parties, the prevailing party in any action brought to enforce the agreement was "entitled to his legal fees, accounting costs and other costs incurred as a result thereof[.]" Walsh, however, failed to ask for his accounting fees in his initial motion for summary judgment. The trial court, therefore, did not award Walsh his accounting fees and costs. Walsh failed to mention the court's failure to award the accountant's fees in his memorandum in opposition to Brousseau's motion for reconsideration. Although Walsh filed a supplemental memorandum regarding his accounting fees, there is no evidence that Walsh sought a ruling on the issue or that the trial court ruled on it. Consequently, we will not consider it on appeal. Finally, Walsh requests attorney fees on appeal. The agreement between the parties provided that the prevailing party in an action to enforce the agreement was entitled to legal fees. Walsh was entitled to attorney fees below, and we hold that he is entitled to attorney fees on appeal. *See* RAP 18.1; *see also West Coast Stationary Eng'rs Welfare Fund v. Kennewick*, 39 Wn. App. 466, 477, 694 P.2d 1101 (1985).

The decision of the trial court is affirmed.

FORREST and KENNEDY, JJ., concur.

Reconsideration denied October 22, 1991.