[No. 28323-9-II. Division Two. September 16, 2003.]

MICHAEL R. PARKER, *Appellant*, v. TUMWATER FAMILY PRACTICE CLINIC, ET AL., *Respondents*.

*Charles K. Wiggins* (of *Wiggins & Masters, P.L.L.C.*), for appellant.

*Cecilia M. Clynch* and *Stephen J. Bean*, for respondents.

ARMSTRONG, J. — Dr. Michael Parker practiced medicine with three partners. Parker and two of his medical partners also owned the Tumwater Family Practice Clinic's (Clinic) building in a partnership. The medical partners expelled Parker under the partnership "without cause" provision even though he had notified the partners that he might be entitled to disability benefits as authorized by the partnership agreement. On the same day the medical partners expelled Parker from the medical practice, the building partnership—without consulting Parker as required by the building partnership agreement—lowered the rent it charged the practice. Parker sued. The trial court granted the defendants partial summary judgment, ruling that the medical partnership was entitled to expel Parker without cause despite his recent alleged disability. After a bench trial, the court ruled that the building partners technically breached the building partnership agreement but found that the breach caused Parker no damages. Parker appeals

all of these rulings. We hold that the trial court erred by finding no damages, and it erred by granting summary judgment on the issue of Parker's expulsion. Accordingly, we remand for trial.

## FACTS

Dr. Michael Parker was a partner in the Tumwater Family Practice Clinic along with Dr. Atteridge, Dr. Martin, and Dr. Gomez. After Dr. Gomez was expelled from the medical practice, the three remaining doctors formed an additional partnership, GAPP, to construct a new medical building for the Clinic. The partners obtained a Small Business Association (SBA) loan to finance the building.

SBA rules required the partnership interests in GAPP and the Clinic to be identical, and they prohibited GAPP from making a profit off the rent it charged the Clinic. The partners agreed in writing that the Clinic would pay GAPP a monthly rent of $13,166, and that the rent would increase over time. At this rate, GAPP did make a profit. Each of the three GAPP partners took $3,000 monthly in excess rent that GAPP received. Ultimately GAPP collected $17,909.67 per month, which was fair market rent for the building.

Dr. Peterson joined the Clinic partnership, but not GAPP. Martin and Atteridge wanted to let Peterson buy an interest in GAPP, but Parker refused unless the partners removed the "expulsion without cause" provision from the Clinic's partnership agreement. The partners refused to do so.

On April 8, 1999, Atteridge, the managing partner of the Clinic (and GAPP), informed Parker by letter about a partnership meeting, scheduled for April 15, for the purpose of possibly expelling Parker from the Clinic partnership. After receiving the letter, Parker suffered a major depression, began seeing a psychiatrist, and did not return to work. On April 13, Parker wrote to Atteridge and the Clinic informing them that his doctor advised him not to work until further notice. He also said that he was unable to

attend the upcoming meeting and asked his partners to delay any vote on his expulsion. The Clinic's partnership agreement allows any partner who cannot attend a meeting to request a delay in voting or to give his proxy to another partner.

The Clinic refused to delay the vote and expelled Parker from the medical partnership. Atteridge informed Parker's patients by letter that Parker requested a leave of absence, was not expected to return, and was no longer seeing patients.

On the same day that the Clinic expelled Parker, Atteridge and Martin, acting as partners of GAPP, lowered the Clinic's rent from $17,909 to $6,627. The GAPP partnership agreement requires that management decisions "shall be made by unanimous agreement of the partners." Ex. 1, § 6.1.

Parker sued the Clinic and GAPP, as well as Atteridge, Martin, and Peterson individually, under a variety of theories. The trial court dismissed on summary judgment all claims based on the medical partnership agreement, ruling that the Clinic followed the correct procedures in expelling Parker and that the partnership agreement did not *require* the partners to delay a vote when requested by a partner.

After a bench trial on the claims related to GAPP, the court ruled that Atteridge technically breached the GAPP agreement when he and Martin decided, without Parker's agreement, to lower the rent. But it found that this breach did not damage Parker because the rent reduction simply brought the partners into compliance with their SBA agreement. It also found that Atteridge and Martin did not breach their fiduciary duty by unilaterally lowering the rent.

## ANALYSIS

### I. Findings of Fact

■ Parker challenges the trial court's findings of fact 8, 9, 11, 12, and 14. We review a trial court's findings to determine whether substantial evidence supports them. *Holland v. Boeing Co.*, 90 Wn.2d 384, 390, 583 P.2d 621 (1978). "Substantial evidence" is evidence sufficient to persuade a "fair-minded person" that the fact is true. *Holland*, 90 Wn.2d at 390-91.

Finding 8 states that the partners became concerned that the "mirror image" between GAPP and the Clinic did not exist and that they violated SBA rules when they included Peterson in the Clinic but not GAPP. It also states that the partners, including Parker, discussed the problem that the rent exceeded GAPP's obligations for mortgage payments, taxes, and maintenance and, thus, violated the SBA regulations. Minutes from the Clinic's February partnership meeting show that this issue was discussed. And the person who took the minutes testified that this issue was also discussed at the March partnership meeting, although she did not record it. Substantial evidence supports this finding.

Finding 9 states that Parker was expelled from the Clinic in April 1999, under the partnership agreement, and that he remains a partner in GAPP. Parker challenges the way he was expelled. We discuss this issue below.

Finding 11 states that GAPP lowered the rent the Clinic paid, after Parker was expelled, to comply with SBA rules. Atteridge testified that this is why he lowered the rent. He believed that he did not need Parker's permission to do this because the higher rent agreement broke the law and he had a duty to rectify the problem. Substantial evidence supports this finding.

Finding 12 states that GAPP's lowering of the rent was to comply with SBA rules and was not a breach of good faith, fair dealing, or fiduciary duty. Instead, Atteridge (on behalf

of GAPP) acted out of a "legitimate and good faith concern" that GAPP comply with the SBA rules. Clerk's Papers at 463. Atteridge's testimony supports this finding. We need not consider this finding, as discussed below in section III (unpublished).

Finding 14 states that Parker presented insufficient evidence that he was damaged by the technical breach and that the court will not award Parker damages. This is a legal conclusion that we discuss in section II.

## II. Damages

Parker argues that the trial court should have awarded him damages after it correctly found that Atteridge and Martin breached the GAPP partnership agreement by reducing the Clinic's rent without his consent.

■ Generally, an injured party damaged by a breach of contract may recover all damages that accrue naturally from the breach and be returned to "as good a pecuniary position as he would have had if the contract had been performed." *Eastlake Constr. Co. v. Hess*, 102 Wn.2d 30, 39, 686 P.2d 465 (1984). Here, the other GAPP partners breached the GAPP partnership agreement when they lowered the Clinic rent without consulting Parker. Parker is entitled to a damage award that would return him to the position he would be in had there been no breach. The lease required the Clinic to pay GAPP $13,166 in monthly rent. This was raised to $16,532 by December 1994. GAPP also received rent money from other tenants in the building. Each of the three partners in GAPP received $3,000 a month from the excess rent until April 1999. Since Parker presumably would have opposed lowering the rent, his damages include the monthly $3,000 he would have received under the old agreement, beginning from the April 1999 breach.

In its written conclusions, the trial court ruled that the evidence was insufficient to support a damage award to Parker. But in oral comments, the court explained that

Parker probably did not prove damages and that the remedy was for the parties to try to reach a unanimous decision about the rent. Ten months after this ruling, the parties returned to court because they could not agree, and Parker moved for reconsideration. The trial court clarified that it had previously denied damages because it was unsure how the SBA would treat the issue.[1] It said the excess rent was just a different way of paying the Clinic partners for their work for that group and it would be unfair to give Parker damages because he no longer produced any of the Clinic's income. The court suggested that it might have awarded damages if Parker had continued to produce income with which the Clinic paid GAPP.

Nothing in the court's reasoning justifies its failure to award Parker damages that would return him to his position before the breach. *Eastlake Constr.*, 102 Wn.2d at 39. The Clinic paid fair market rent for its building space before the rent reduction. And the Clinic continued to occupy the same space after the rent reduction. Whether Parker was still an income producing member of the Clinic has no bearing on the Clinic's obligation to pay the agreed upon rent. The two partners' rent reduction simply took income to which GAPP was entitled and transferred it to the Clinic. This breach of the GAPP agreement entitles Parker to damages of $3,000 a month.

But the other GAPP partners argue that the partners were violating the law, the SBA regulations, and the SBA's standard operating procedures by paying the excess rent. Parker was not damaged, they contend, because he agreed in the original lease and GAPP partnership not to make a profit off the rent and because he had an affirmative obligation to comply with the loan documents and the SBA rules.

Generally, contracts that violate a statute are illegal and unenforceable. *Smith v. Skone & Connors Produce, Inc.*, 107 Wn. App. 199, 207, 26 P.3d 981 (2001), *review*

---

[1] After the bench trial was done, the SBA approved the higher rent.

*denied*, 145 Wn.2d 1028 (2002). But "[i]f a contract violates a business statute or regulation, the contract is not void unless the act expressly provides for invalidation of conflicting contract provisions." *Smith*, 107 Wn. App. at 208. The GAPP partners cite two cases in support of their "illegal agreement" argument, but both cases dealt with contracts that called for criminal conduct. *Hederman v. George*, 35 Wn.2d 357, 360, 212 P.2d 841 (1949) (agreement to privately sell stock was gross misdemeanor); *Sinnar v. LeRoy*, 44 Wn.2d 728, 730, 270 P.2d 800 (1954) (agreement to provide beer license was of serious nature because it concerned a matter exclusively within the realm of the state). But if the agreement violates any rules at all, it violates business statutes or regulations. Under *Smith*, the agreement is therefore void only if the statutes or regulations specifically deem it invalid. *Smith*, 107 Wn. App. at 208.

Atteridge and Martin claim that the agreement violates a federal regulation, the SBA's standard operating procedures, and the loan document. These rules and documents prohibit GAPP from charging rent that exceeds the costs of debt service, maintenance, taxes, and insurance. GAPP would be ineligible for the SBA loan if the rent exceeded these costs. But a violation of the rules is not a crime as in *Hederman* and *Sinnar*. Nor do the rules specifically provide that the loan becomes invalid if GAPP violates the rules. Rather, a violation of the rules allows the SBA to accelerate or terminate the loan or foreclose on the building. We conclude that the agreement to pay excess rent was not an illegal, unenforceable contract.[2] The trial court should have awarded Parker damages of $3,000 per month since the breach.

---

[2] Moreover, the SBA has since approved the higher rent payments. Parker did not offer this evidence, however, until well after the bench trial was completed. The other GAPP partners were unable to question SBA about the details of its approval. Apparently because of this, the trial court considered SBA's approving letter but gave it little or no weight and said it did not change the court's decision on damages.

■ Moreover, even if the partnership agreement was illegal, Atteridge and Martin are not in a good position to raise this argument. "Courts will not allow themselves to be used for the purpose of conferring benefits upon litigants who plead the illegality of a contract into which they entered, when there has been a part performance of the contract, and when the relative positions of the contracting parties have been changed." *In re Estate of Field*, 33 Wash. 63, 78, 73 P. 768 (1903). Atteridge and Martin accepted the benefits of the excess rent agreement until their dispute with Parker arose. Then they repudiated the agreement as illegal. But this repudiation harmed only Parker. Atteridge and Martin no longer received their $3,000 per month from GAPP; but as partners in the Clinic, they kept the excess rent previously paid to GAPP, presumably as additional Clinic profit. By thus manipulating the income between GAPP and the medical partnership, Atteridge and Martin sought to enrich themselves at Parker's expense—precisely the kind of conduct the cases have condemned. *Walsh v. Brousseau*, 62 Wn. App. 739, 745-46, 815 P.2d 828 (1991).

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

QUINN-BRINTNALL, A.C.J., and SEINFELD, J., concur.

Review denied at 151 Wn.2d 1022 (2004).