[No. 66935-4-I.   Division One.   September 19, 2011.]

STEVE B. DIXON, *Respondent*, v. CRAWFORD, McGILLIARD, PETERSON & YELISH ET AL., *Appellants*.

*Catherine Wright Smith* (of *Smith Goodfriend PS*), for appellants.

*Paul E. Brain* (of *Brain Law Firm PLLC*), for respondent.

¶1 ELLINGTON, J. — This case involves the valuation of a law partnership upon the voluntary disassociation of one partner. The chief question is whether goodwill is properly recognized as an asset. It is. We affirm.

## BACKGROUND

¶2 The Port Orchard law firm of Crawford, McGilliard, Peterson & Yelish (Crawford) was established in 1980. In 1984, Steve Dixon joined the firm. He became a full equity partner in 1991.

¶3 From its formation, the firm's business strategy was to develop a public defense practice to the point it could be serviced by salaried employees, allowing the partners to build practices in other areas. Dixon participated in the successful implementation of this strategy during the 1990s and early 2000s. Public defense contracts generated over half the Crawford firm's gross income and paid the partnership's overhead as well as the salaries of employees who

handled the contract work. Founding partner William Crawford was largely responsible for negotiating the contracts, which typically ran from one to three years.

¶4 The firm had no written partnership agreement. Each of the five equity partners owned a 20 percent interest in the firm and received 20 percent of the profits annually. The equity partners each took annual draws in the range of $192,438 to $230,380. During those years, Dixon generated fee income of $231,182 to $249,434.

¶5 Dixon left the firm on April 3, 2006. All his civil practice clients chose to follow him to his new office.

¶6 In June 2008, a nonequity junior partner, Tim Kelly, also left Crawford. Claiming an equity interest in the firm, he sued for an accounting and purchase of his interest. Concerned about possible liability should Kelly prevail, Dixon intervened. Kelly subsequently dismissed his claim, but Dixon continued the suit, asserting a right to a buyout of his own interest.

¶7 To establish the value of his share in the firm, Dixon presented accounting expert Joe Lawrence. Lawrence used the "capitalization of excess earnings" method, which combines the income approach (for intangible assets or goodwill) and the cost approach (for tangible assets). Lawrence determined the goodwill value to be the difference between the firm's earnings and the remaining partners' collective "replacement values," adjusted for taxes and for future risk and growth (capitalization). Lawrence ultimately valued Dixon's one-fifth interest in the firm between $350,000 and $360,000, which he testified included both tangible and intangible assets.

¶8 Crawford presented three accounting experts: James Weber, Steve Kessler, and Roland Nelson. Although Nelson testified that in his experience there is no goodwill value in a law practice, both Weber and Kessler testified that goodwill value does exist in law firms. All three agreed that to the extent there is goodwill value, capitalization of excess

earnings is an appropriate valuation method. Weber and Kessler each used significantly higher replacement values for Crawford's remaining partners than did Lawrence, and concluded that given those replacement values, there was no goodwill value in the firm, leaving only the tangible assets. All the experts put Dixon's interest in the tangible assets between $36,000 and $48,000.

¶9 The trial court considered the various valuation methodologies and the age, demonstrated earning power, and professional reputation of the firm. It found that the Crawford firm was highly respected and has "long enjoyed success as a preeminent public defense firm."[1] The court adopted the capitalization of excess earnings method, using replacement values between those suggested by the experts. Ultimately the court valued the firm at $1,160,714.00 Dixon's one-fifth interest was therefore $232,143.00. The court entered judgment in this amount, plus prejudgment statutory interest of $99,140.96, plus costs and fees, for a total award of $332,102.51.

¶10 Crawford appeals, contending the court erred by including goodwill in its valuation. Crawford also contends the court erred in its method of valuing goodwill, by precluding evidence of Dixon's postdissociation earnings, and by awarding prejudgment interest. Dixon cross appeals, contending the court failed to recognize and award his portion of the value of Crawford's tangible assets.

## DISCUSSION

¶11 Where a partner dissociates from an ongoing partnership in the absence of any agreement as to distribution of the dissociated partner's interest, the buyout price for the partnership interest is governed by RCW 25.05.250(2):

The buyout price of a dissociated partner's interest is the amount that would have been distributable to the dissociating

---

[1] Clerk's Papers at 368 (Finding of Fact 22).

partner under RCW 25.05.330(2) if, on the date of dissociation, the assets of the partnership were sold at a price equal to the greater of the liquidation value or *the value based on a sale of the entire business as a going concern without the dissociated partner* and the partnership were wound up as of that date. Interest must be paid from the date of dissociation to the date of payment.[2]

The parties agree that the statute controls and that Dixon's interest should be valued under the "going concern" approach.

▇ ¶12 The statute gives the court discretion to determine the buyout price of a dissociated partner's interest, and we will not disturb its decision absent abuse of that discretion.[3]

### *Goodwill*

[3, 4] ¶13 The value of a business typically includes the value of its intangible assets, also known as "goodwill,"[4] which is

> "a benefit or advantage which is acquired by an establishment . . . in consequence of the general public patronage and encouragement, which it receives from constant or habitual customers on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices."[5]

Essentially, goodwill is the monetary value of a reputation. It is a way of recognizing earnings not strictly attributable to the value of the work performed. It is distinguishable

---

[2] (Emphasis added.)

[3] RCW 25.05.250(9); *In re Marriage of Tower*, 55 Wn. App. 697, 700, 780 P.2d 863 (1989).

[4] *Bank of Wash. v. Burgraff*, 38 Wn. App. 492, 499, 687 P.2d 236 (1984).

[5] *In re Marriage of Lukens*, 16 Wn. App. 481, 483-84, 558 P.2d 279 (1976) (internal quotation marks omitted) (quoting ALAN R. BROMBERG, CRANE AND BROMBERG ON PARTNERSHIP § 84 n.61 (1968)).

from the skill, education, and earning capacity of a practicing professional.[6]

¶14 Crawford first contends the Rules of Professional Conduct (RPC) prohibit the inclusion of goodwill in the buyout price for a law partnership,[7] and prohibit considering earnings from public defense contracts. Whether there is a violation of the RPC is a question of law reviewed de novo.[8]

¶15 For the first argument, Crawford cites *Walsh v. Brousseau*.[9] At issue in *Walsh* was the outright sale of a law practice, including goodwill, where the seller promised to encourage clients to use the buyer's services.[10] We held the sale violated RPC 7.2, which prohibits the solicitation or referral of clients for compensation.[11]

¶16 *Walsh* offers no guidance here because there was no sale and no such promise. Instead, the court is asked to value a going concern. Crawford cites no law, policy, or disciplinary rule that prohibits Dixon from recovering his share in the value of Crawford's goodwill as of the time he

---

[6] *In re Marriage of Hall*, 103 Wn.2d 236, 241-42, 692 P.2d 175 (1984) (salaried professionals do not have goodwill value, which is particular to professionals who earn more than they could be expected to if they were paid a salary for their services).

[7] We reject Dixon's claims that Crawford waived this argument because it is an affirmative defense under CR 8(c) and should have been affirmatively pleaded, and by first raising it in a motion for reconsideration. *See In re Estates of Palmer*, 145 Wn. App. 249, 258, 187 P.3d 758 (2008). Where failure to plead a defense affirmatively does not affect substantial rights of the parties, the noncompliance will be considered harmless. *Mahoney v. Tingley*, 85 Wn.2d 95, 100, 529 P.2d 1068 (1975). Dixon had opportunity to address the argument in his response to the motion for reconsideration and suffered no prejudice. Raising an issue in a motion for reconsideration is sufficient to preserve it for appeal. *See, e.g., State v. Ledenko*, 87 Wn. App. 39, 42 n.2, 940 P.2d 280 (1997).

[8] *State v. Hunsaker*, 74 Wn. App. 38, 42, 873 P.2d 540 (1994).

[9] 62 Wn. App. 739, 815 P.2d 828 (1991).

[10] *Id.* at 743-44 (discussing *Geffen v. Moss*, 53 Cal. App. 3d 215, 125 Cal. Rptr. 687 (1975)).

[11] *Id.* at 744-45.

dissociated.[12] Further, numerous cases have addressed the valuation of law firm goodwill where a partner's marriage is dissolved.[13] The court properly included goodwill in the valuation of the firm.

¶17 In determining goodwill value, the court adopted Lawrence's determination of Crawford's earnings. These included income from the public defense contracts. Crawford contends this amounts to "the forced purchase and sale of the firm's public defense contracts,"[14] improperly treats the contracts and clients as commodities in violation of RPC 7.3,[15] and allows Dixon to profit from clients to whom he had no responsibility, in violation of RPC 1.5(e).[16]

¶18 These arguments are unfounded. The contract revenues were part of the firm's historical earnings, capitalized downward to account for their reduced contribution over time. Considering all the firm's earnings does not treat clients as commodities, and the court did not purport to transfer an interest in the contracts. Further, Crawford does not explain how, for purposes of valuing goodwill, public defense contracts are different from agreements to handle litigation matters for a group of employees or union members or retirees or any other client group. Finally, the allegation that the valuation method allows Dixon to profit from clients for whom he had no responsibility ignores the fact that a dissociating partner's interest is determined as of the date of his departure. Until that moment, all the

---

[12] In 2006, the Supreme Court revised RPC 1.17 to include a specific provision allowing the purchase and sale of the goodwill of a law practice if certain conditions are satisfied.

[13] *See In re Marriage of Brooks*, 51 Wn. App. 882, 884, 756 P.2d 161 (1988); *Hall*, 103 Wn.2d at 242; *In re Marriage of Fleege*, 91 Wn.2d 324, 327, 588 P.2d 1136 (1979).

[14] Appellants' Br. at 21.

[15] RPC 7.3 prohibits the solicitation or referral of clients for compensation.

[16] RPC 1.5(e) allows fee splitting between attorneys in different firms only as related to the lawyers' responsibilities to their clients.

partners, including Dixon, had responsibilities to those clients. The court properly included earnings from the public defense contracts in the valuation of the firm.

## *Valuation Method*

¶19 Valuation of goodwill is a question of fact, and findings supported by substantial evidence will not be reversed on appeal.[17] "Substantial evidence" is that sufficient to persuade a fair-minded person of the truth of a premise.[18]

¶20 The court adopted the capitalization of excess earnings method, noting that four of the five experts agreed[19] it was the appropriate method. Despite its experts' endorsement, Crawford nonetheless contends the method is used "exclusively" in marital dissolution cases where the professional spouse's earning capacity is considered an asset to which the nonprofessional spouse contributed.[20] Thus, Crawford argues, "[t]he dissociating partner departs with goodwill based on his work and reputation while at the firm, whereas a divorcing spouse will cease to have any benefit from the partnership [and] has no professional reputation to take with them."[21]

¶21 This argument has neither logic nor support in the cases. Goodwill is a recognized asset of a professional practice. For example, in *In re Marriage of Hall*, the court observed that goodwill is a distinct asset of a professional

---

[17] *Hall*, 103 Wn.2d at 246.

[18] *Id.*

[19] Dixon's other expert, Allan Vander Hamm, used a discounted cash flow method in valuing the public defense contracts.

[20] Dixon asserts Crawford did not make this argument below and has thus waived it on appeal under RAP 2.5(a). But the record shows Crawford raised this issue in its motion for reconsideration and at oral argument in support of that motion, which is sufficient to preserve the issue for appeal.

[21] Appellants' Br. at 24-25.

practice above and beyond earnings capacity.[22] "When a professional retires or dies, his earning capacity also either retires or dies. Nevertheless, the goodwill that once attached to his practice may continue in existence in the form of established patients or clients, referrals, trade name, location and associations which now attach to former partners or buyers of the practice."[23] There is no suggestion in the cases that certain valuation methods apply only for purposes of marital dissolution whereas other methods apply for partnership dissociation.

¶22 Crawford argues, however, that the dissolution context is unique in that "it is largely based on the need to protect the nonprofessional spouse"[24] in fairly dividing the marital estate, whereas there is no need to protect a withdrawing partner. Essentially Crawford contends an asset with value in a dissolution has no value otherwise, and has value in a dissolution only where there is a nonprofessional spouse in need of protection. Nothing in the cases supports these theories. Crawford ignores the premise underlying the dissolution cases: goodwill is an asset with value.

¶23 Crawford also attempts to discredit the court's methodology on grounds that it valued the firm by determining the sum of the individual partners' goodwill. Crawford cites to *Brooks* for the proposition that "a professional's individual goodwill may be independent of his law firm interest."[25] This is true but irrelevant. In *Brooks*, corporate bylaws excluded, as between the partners, any value for goodwill.[26] The question was whether those bylaws precluded valuation of goodwill in a partner's marital dissolution. The court held that notwithstanding any agree-

---

[22] 103 Wn.2d 236, 241, 692 P.2d 175 (1984).

[23] *Id.*

[24] Appellants' Br. at 23.

[25] *Id.* at 26 (citing *In re Marriage of Brooks*, 51 Wn. App. 882, 889, 756 P.2d 161 (1988)).

[26] *Brooks*, 51 Wn. App. at 883.

ment among the partners, goodwill was an asset valued separately from the partnership and subject to distribution upon dissolution of a partner's marriage.[27]

¶24 Here, there was no agreement excluding claims for goodwill among the partners, and the court valued the firm's goodwill to determine Dixon's share. The excess earnings method is a logical way to determine the value of Crawford's goodwill. One hundred percent of Crawford's profits were distributed equally among the partners. The capitalization of the difference between their earnings and the sum of the remaining partners' individual replacement values provides an accurate reflection of the goodwill value of the firm as a whole. Neither here nor below did Crawford suggest a more accurate means of valuation. And again, Crawford's own experts endorsed the method adopted by the court.

¶25 When Dixon dissociated from Crawford, he left Crawford's goodwill—to which he contributed—with Crawford.[28] To the extent Dixon deprived Crawford of some of its goodwill by removing himself from the firm, the court's method recognized that by valuing Crawford without Dixon. This adheres to the requirements of RCW 25.05.250.

¶26 There is no definitive formula for ascertaining the value of goodwill.[29] The expert testimony provided substantial evidence to support the court's ruling. The court's use of the excess earnings method to determine Dixon's interest in Crawford was not an abuse of discretion.

## Postdissociation Financial Data

¶27 The trial court refused to permit discovery or consider evidence of Dixon's postdissociation earnings.

---

[27] *Id.* at 884-86.

[28] *See Hall*, 103 Wn.2d at 241.

[29] *Lukens*, 16 Wn. App. at 486.

Crawford contends such evidence was necessary to a fair calculation of Dixon's interest because Dixon was compensated for his contribution to Crawford's goodwill when he took his clients with him: "Plaintiff in effect received his share of any goodwill in the firm in taking a substantial portion of the firm's clients."[30]

¶28 Crawford cites to *Harstad v. Metcalf*, which held that where two partners dissolved their partnership, divided their assets, and started separate businesses, there was no goodwill in either the former partnership or the new businesses to which the former partners had a claim.[31] The obvious distinction in this case is that the Crawford partnership is a going concern and continues to enjoy the goodwill it built over three decades.

¶29 Crawford equates "taking a substantial portion of the firm's clients" with "taking goodwill." A firm's current clients may be evidence of the firm's "expectation of continued public patronage,"[32] but clients are not a commodity.[33] Neither Dixon nor Crawford has a proprietary interest in the clients.[34] Further, the experts, including Crawford's experts, agreed that the capitalization of excess earnings method was the proper methodology, and there is no place in that method for consideration of postdissociation earnings.

¶30 Under RCW 25.05.250(2), the value of a partnership must be based on the value "of the entire business as a going concern *without the dissociated partner*."[35] Thus, a dissociated partner is not compensated for value taken by his or her departure from the firm. The court did not abuse its discretion in declining to permit discovery or evidence

---

[30] Appellants' Br. at 28.

[31] 56 Wn.2d 239, 242, 351 P.2d 1037 (1960).

[32] *See Lukens*, 16 Wn. App. at 483.

[33] *See Walsh*, 62 Wn. App. at 743-44.

[34] *See Koehler v. Wales*, 16 Wn. App. 304, 311-12, 556 P.2d 233 (1976).

[35] (Emphasis added.)

intended to value goodwill that "Mr. Dixon took with him out the door."[36]

## Statutory Interest

¶31 The court added 12 percent per annum interest from Dixon's date of dissociation to his pro rata interest in Crawford, an additional $99,140.96. Crawford argues this is contrary to Washington cases disfavoring prejudgment interest to a discretionary judgment amount.

¶32 RCW 25.05.250(2) provides, "Interest must be paid from the date of dissociation to the date of payment." RCW 25.05.250(9) further provides, "The court shall determine the buyout price of the dissociated partner's interest . . . and accrued interest, and enter judgment for any additional payment or refund."

¶33 Crawford's argument is that this provision exceeds the legislature's authority. Comment 3 to the revised Uniform Partnership Act (codified as RCW 25.05.250(2)) provides that "[s]ince the buyout price is based on the value of the business at the time of dissociation, the partnership must pay interest on the amount due from the date of dissociation until payment to compensate the dissociating partner for the use of his interest in the firm."[37] Crawford complains this purpose is not served by the mandatory imposition of statutory interest, but offers no explanation as to why the legislature is not empowered to adopt a rule requiring prejudgment interest.

¶34 The court properly included interest in Dixon's award.

---

[36] Appellants' Br. at 29.

[37] Unif. P'ship Act § 701 (amended 1997), 6 U.L.A. 177 (2001).

*Tangible Assets*

¶35 Dixon cross appeals from the court's finding that its valuation method includes tangible assets.[38] He contends the court should increase the judgment to reflect his interest in the tangibles. But in both his testimony and his report, Lawrence stated that his valuation method included both tangible and intangible assets. The court adopted Lawrence's method.[39] The court did not abuse its discretion in finding its valuation included both tangible and intangible assets.

¶36 We affirm the trial court in all respects.[40]

BECKER and SPEARMAN, JJ., concur.

---

[38] Clerk's Papers at 368 (Finding of Fact 25).

[39] Clerk's Papers at 367 (Finding of Fact 20).

[40] Crawford assigns error to denial of its motion for reconsideration but offers no separate argument in support of its assignment. We therefore do not address it. *See* RAP 10.3(a)(4), (6).