IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| BRYAN W. McLELLAND, D.D.S. and KRISTA McLELLAND, husband and wife, and the marital community composed thereof, and BRYAN W. McLELLAND, D.D.S., P.S., a Washington professional services corporation, | ) ) ) ) ) ) ) ) | No. 35401-6-III |
| Respondents, | ) ) | |
| v. | ) ) | PUBLISHED OPINION |
| MARK C. PAXTON, D.D.S. and DIANE S. PAXTON, husband and wife, and the marital community thereof, and MARK C. PAXTON, D.D.S., P.S., a Washington professional services corporation, | ) ) ) ) ) ) | |
| Appellants. | ) | |

FEARING, J. — We review a complicated dissolution, between two oral surgeons, of a professional limited liability company, which review includes the question of whether such a company can possess goodwill separate from the professional practitioners. We affirm all rulings of the trial court, including the finding of goodwill, except that we reverse the grant of prejudgment interest afforded respondent Bryan McLelland on the assets awarded him.

FACTS

Respondent Bryan McLelland is and appellant Mark Paxton was an oral and maxillofacial surgeon. Paxton died during the pendency of this appeal, and this court substituted the Estate of Mark Paxton as appellant. We will, however, still refer to the appellant as Mark Paxton. The facts of this appeal become complicated because of the various corporations and limited liability companies utilized by Paxton and McLelland when conducting an oral and maxillofacial practice. Despite the use of other business structures, the parties sometimes treat the dispute as one between partners. The parties alternatively label the dispute as centering around the dissolution of a professional limited liability company owned by corporations maintained by McLelland and Paxton or centering around the dissolution of a partnership between McLelland and Paxton. The parties alternatively refer to the relevant claimant as Bryan McLelland or McLelland P.S. and alternatively call the appellant Mark Paxton or Paxton P.S.

In March 2003, Mark Paxton hired Bryan McLelland as an associate in Paxton's oral surgery practice. In March 2005, McLelland and another associate, Melanie Lang, each through his or her individual professional service corporation, respectively purchased a one-third interest in Paxton's practice also owned by Paxton in a professional services corporation. We identify the three professional service corporations as Paxton P.S., McLelland P.S., and Lang P.S. McLelland P.S. and Lang P.S. each paid Paxton

P.S. $619,835, for a total of $1,239,670, to purchase the interests in the oral surgery practice.

On March 25, 2005, the parties entered executed acquisition agreements to consummate the purchases. Under the agreement between McLelland P.S. and Paxton P.S., McLelland P.S. purchased an undivided interest in the assets of Paxton's practice, "including equipment, furniture, and fixtures, accounts receivable, supplies, one of the buildings in which the practice is operated, *goodwill*, and patient files." Clerk's Papers (CP) at 2215 (emphasis added). $261,667 of the $619,835 purchase price paid by McLelland was allocated for the practice's goodwill. The acquisition agreement entered by Lang P.S. possessed similar language.

To define the rights and responsibilities attended to the three oral surgeons' interests in the oral and maxillofacial practice, the three professional services corporations entered into a partnership agreement. We quote relevant portions of the lengthy partnership agreement, replete with a table of contents, entered by Paxton P.S., McLelland P.S., and Lang P.S. The terms of the agreement control some of the issues on appeal. The agreement, with a penchant for capitalization, read:

> Unless otherwise agreed by the Parties and Shareholders, however manifested or evidenced, the *goodwill of the Partnership* shall be owned, or considered owned, by the Shareholders, in undivided interests, based on Percentage Ownership of the Partnership.

3

CP at 45 (emphasis added). The partnership agreement prohibited transfer to a third

party of

> any interest in the "contract receivables" (oral and maxillofacial
> surgery contracts in progress), accounts receivable, patient records, or
> *goodwill of the practice*, the Partnership, any of the Parties, or any of the
> Shareholders.

CP at 47 (emphasis added). The partnership agreement also declared that the partnership

could

> be terminated on at least six (6) months' notice by any of the Parties,
> at or after the Initial Term, however, the termination date must correspond
> to an anniversary hereof.

CP at 35. The partnership agreement further read:

> It is hereby acknowledged by the Parties and Shareholders that no
> definite and equitable methodology presently exists for dividing the jointly
> owned Practice Interests of the Parties and Shareholders, upon termination
> of this Agreement, for any reason. The Parties and Shareholders further
> appreciate that future economic and financial uncertainties further make it
> impossible to define such a methodology. Consequently, upon the
> termination of this Agreement, and the necessary division of the jointly
> owned Practice Interests, the Parties agree to negotiate, in good faith, so to
> divide such jointly owned Practice Interests. Further, the Parties will then
> determine which of the Parties will continue to practice at each of the
> places of business of the Partnership.

CP at 79.

The partnership agreement provided, in pertinent part:

> Default; Dissolution and Reconstituting.
> A. Default Defined. It is agreed that upon the occurrence of any of
> the following events, constituting defaults, this Agreement may be
> dissolved, either during the Initial Term, or any annual renewal period, at

4

the option of the non-defaulting Party or Parties, except for those provisions expressly intended and provided for to survive.  Such events are as follows:

. . . .

(viii)  Claim Against Other Parties or Shareholders.  Any of the Parties or any of the Shareholders shall take any action, or fail to take any action, which results in any material claim, suit, or action being filed, or threatened or asserted in any way against any of the other Parties or Shareholders, except fully insured malpractice claims (the deductible of which shall be paid by the Party or Shareholder who treated the patient making such malpractice claim), or which results in any material damage to or material liability of any of the other Parties or Shareholders.

CP at 50-52.

One partnership agreement paragraph addressed an award of prejudgment interest.

The paragraph reads:

B.  Interest on Unpaid Monies.  Whenever herein it is provided that a Party or a Shareholder shall pay any sums of money, either to any of the other Parties or other Shareholders, or to third parties, including, but not limited to . . . all other sums required to be so paid hereunder, or under the terms of any other documentation entered into in connection herewith, notwithstanding any contrary terms thereof, if any of such sums are not paid, as and when due and payable to the other Parties or Shareholders, or to third parties, if the other Parties or Shareholders, in the case of sums being owed to third parties, shall be then, or at any time thereafter, required to pay the sums owed by such Party or Shareholder by whom such sums are owed, to any such third party, for any reason, including as a result of being jointly or severally liable for the payment of all or any portion of such sums, or in order to protect their own interests or assets, and including any pension plan for the benefit of employees, such sums shall bear interest at the highest lawful rate, from the due date, until paid.

CP at 82-83.  Finally, a closing paragraph declared:

> If any action at law or in equity is necessary to enforce the terms of this Agreement, the prevailing Party or Parties, or Shareholder or Shareholders, shall be entitled to reasonable attorneys fees and costs, in addition to any other relief to which entitled.

CP at 83.

In late 2005, after briefly existing as Paxton, Lang, and McLelland Oral and Maxillofacial Surgery Partnership, the three oral surgeons changed the business entity that conducted the surgery practice from a general partnership to a professional limited liability company, Spokane OMS, PLLC. Spokane OMS thereafter conducted business under the trade name Spokane Oral & Maxillofacial Surgery. Despite the formation of a limited liability company, the partnership agreement remained the governing document for the relationship between the three surgeons and their respective professional services corporations. The record does not show that they executed any operating agreement for the professional limited liability company or that the oral surgeons or any of their corporations entered any new agreement on the formation of the limited liability company.

Spokane OMS maintained two office locations in 2005: a Spokane Valley office and a South Hill office. Melanie Lang and Bryan McLelland created a separate entity, SOMFS Property Holdings, LLC when they purchased interests in the oral and maxillofacial practice. SOMFS bought a two-thirds interest in the Spokane Valley building, while Paxton P.S. held the remaining one-third interest.

6

Mark Paxton and his wife, Diane Paxton, owned a 20 percent interest in South

Stone, LLC, which originally leased the South Hill location of the oral and maxillofacial

practice to Paxton P.S. After McLelland P.S. and Lang P.S. acquired an interest in the

practice, Spokane OMS paid rent to South Stone for the South Hill location. In 2008, the

three doctors' respective professional service corporations purchased a fractional interest

in a third building, a Post Falls, Idaho office, owned principally by another entity. The

practice opened a third location for the oral and maxillofacial practice in the Post Falls

office building.

In June 2014, McLelland P.S. and Paxton P.S. each paid Lang P.S. $265,000,

including $121,250 in goodwill, to purchase her interest in the practice. The three

surgeons agreed to a discounted price for Lang's interest after McLelland and Paxton

demanded that Lang exit the practice "for significant reasons." Report of Proceedings

(RP) at 87. The record does not disclose those reasons. As a consequence of the

purchase of Lang P.S.'s interest, Paxton P.S. and McLelland P.S. each owned an

undivided one-half interest in the assets of Spokane OMS, PLLC. Following Lang's

departure, McLelland and Paxton continued to operate the practice from the three

separate locations.

Bryan McLelland and Mark Paxton also encountered unknown irreconcilable

differences and began to discuss separation and division of assets. On August 4, 2014,

Bryan McLelland, through counsel, sent a letter to Mark Paxton's counsel declaring

McLelland's intent to dissolve Spokane OMS in six months, as allowed by the partnership agreement. The lengthy letter also responded to an offer by Paxton with regard to a division of the professional limited liability company's assets. Consistent with the partnership agreement, the two surgeons began negotiating the division of the practice's assets, including assignments to the surgeons of the locations where the limited liability company held offices. Under the terms of the partnership agreement, the oral and maxillofacial partnership contractually dissolved on February 28, 2015, six months after Bryan McLelland gave his notice.

On June 23, 2015, Bryan McLelland's counsel sent a letter to South Stone, LLC requesting that South Stone lease, in part, the oral and maxillofacial practice's South Hill location to McLelland, P.S. South Stone declined the request. Accordingly, McLelland's and his corporation's ability to practice at the South Hill location ended.

PROCEDURE

On January 28, 2015, Bryan McLelland and McLelland P.S. sued Mark Paxton and Paxton P.S. for breach of contract, detrimental reliance, negligent misrepresentation, breach of the implied duty of good faith and fair dealing, and breach of fiduciary duties. As part of the action, Bryan McLelland and his corporation sought dissolution of Spokane OMS, PLLC. On March 20, 2015, the superior court, by stipulated order, judicially dissolved the partnership of McLelland P.S. and Paxton P.S. pursuant to RCW 25.15.275, a former limited liability company statute. On that same day, the

8

superior court appointed a receiver to supervise the winding down process and to preserve the professional limited liability company's business as a going concern for a reasonable period of time until a final division of Spokane OMS's assets and liabilities between the owners of the company and until Mark Paxton and Bryan McLelland could practice separately. After the judicial dissolution, Paxton P.S. and McLelland P.S. continued to utilize the limited liability company's assets, including its equipment, location, employees, name, website, and phone number. The two surgeons divided the staff and files by agreement and continued to practice in the same three locations. Meanwhile, the parties continued to negotiate details of the dissolution, including locations of the respective practices.

In May 2015, without advance notice, South Stone, LLC, owned in part by Mark Paxton, evicted Spokane OMS and McLelland P.S. from the South Hill office. South Stone then entered into a new long-term lease with Paxton P.S. for the location.

On November 24, 2015, Mark Paxton and Paxton P.S. asserted counterclaims against Bryan McLelland and McLelland P.S. for (1) interference with contractual relationships, (2) breach of contract for refusing to provide financial contributions as agreed by the parties, (3) invasion of privacy for intentionally intercepting and converting e-mail communications between Paxton P.S. and its employees and between Dr. Paxton and South Stone, LLC, (4) infringement of intellectual property rights in a logo and tradename, (5) breach of fiduciary duty and self-dealing because of McLelland's

9

treatment of patients with a device and treatment protocol named NuCalm, in which

McLelland owned an interest, (6) and breach of the duty of good faith and fair dealing in

failing to inform Paxton of McLelland's ownership interest in NuCalm and American

Healthcare Lending. On March 18, 2016, Bryan McLelland and McLelland P.S.

amended their complaint to include an allegation of constructive fraud against Mark

Paxton and Paxton P.S. for evicting McLelland from the South Hill office.

Before trial, the parties presented competing motions for summary judgment. The

trial court granted McLelland P.S.'s motion for partial summary judgment that

determined Paxton P.S. breached the partnership agreement, breached its fiduciary duties,

and committed constructive fraud by evicting Spokane OMS and McLelland P.S. from

the South Hill location in June 2015. A summary judgment order read that McLelland

P.S. withdrew its claims against Paxton P.S. for three incidents of alleged theft of patients

and for the alleged theft of $100,000.

As part of the competing summary judgment motions, Paxton P.S. moved for

partial summary judgment on the issue of whether McLelland P.S. can recover an amount

for the goodwill of Spokane OMS as part of the limited liability company dissolution.

Paxton argued that, as a matter of law, the oral and maxillofacial practice lacked any

goodwill after February 28, 2015, because the limited liability company was dissolved

and was no longer a going concern. The trial court ruled that the existence and value of

goodwill of Spokane OMS raised questions of fact, and the court thereby denied the summary judgment motion.

The remaining claims and counterclaims went to trial. Mark Paxton and Bryan McLelland reached a settlement agreement on the second day of trial regarding the logo and name of the practice, with Paxton agreeing to pay $20,000 for the rights to both. The principal questions at trial surrounded the existence and value of goodwill of the practice.

Bryan McLelland called to testify valuation expert Lenore Romney. Romney testified that the oral and maxillofacial practice had enterprise goodwill that an appraiser could value on a going concern basis. Romney averred:

> [McLELLAND COUNSEL:] And then the—the very next sentence in that same paragraph, you state, "Since the assets would continue in use, my opinions represent *fair market value on a going concern basis*." Can you explain that opinion to this court?
>
> [ROMNEY:] So we—we have a unique situation in—in this—in this case. It's unlike a—a corporation that we might value where all of the assets are owned by the business we're valuing, okay? So in this case, the way the parties set it up is Dr. Paxton's professional corporation sold undivided interests in these practice assets to the individual, Dr. Lang and Dr. McLelland's, professional corporations; but then they have a separate entity that's administering the practice affairs, and that entity doesn't own any of these assets. So it's—it's unlike maybe what you might think of as the typical situation. So these assets that we're talking about that have to be—that are still owned in undivided interest, that now we have to figure out what to do with that comprise the assets in use at the practice locations, are actually owned in Dr. McLelland's PC and Dr. Paxton's PC in undivided interest. So the only way we can really think about them is that the assets are at the locations, that that's what comprises the [S]OMS practice; we have three locations, and all the assets that were originally acquired by Dr. McLelland in 2005 are still all in use at those offices today.

11

And so that's what "going concern" means, is that you're going to continue using these assets. And so this entity, the PLLC that ends up dissolving after they're not going to practice together anymore, is irrelevant, because it never owned the assets in the first place. So—but that doesn't mean that the assets inside of the two docs' professional corporations, they are still being used, they are continued to use. So from the [S]OMS practice standpoint, it's still a going concern, those assets are being used.

RP at 273-74 (emphasis added). Romney testified that many of the same features that the practice had on February 28, 2015, still existed at the time of trial:

[T]he locations are still being used; . . . the name that the practice calls itself . . . is still . . . a presence; the website is still active; the phone numbers are still in use; and . . . many of the same . . . staff are still working at the offices; and . . . the systems and the procedures that the parties used before [the] 3/1/2015 [dissolution] are still being used.

RP at 267.

Lenore Romney declared that the value of goodwill of the oral and maxillofacial practice could be calculated by assessing a discrete value for each of the three practice locations. While relying on a fair market approach, Romney calculated a goodwill value of $821,760 for the Valley office, $503,470 for the South Hill office, and $497,158 for the Post Falls office, for a total goodwill value of $1,822,388. Romney relied on "value indications" from the 1999 practice prospectus for Mark Paxton's solo practice, the goodwill value used for the McLelland P.S. and Lang P.S. 2005 purchases of an undivided interest in the practice, the McLelland P.S. and Paxton P.S. 2014 purchase of the Lang P.S. interest in the limited liability company, and the 2014 *Goodwill Registry*, a

recognized industry source that reports on sales of professional practices. By employing

the 2005 purchase price, Romney determined that patient files represented 8.1 percent

and goodwill represented 25.3 percent of the value of the practice. When combined, the

two components equaled a total intangible value of the practice of 33.4 percent. Romney

then identified the net practice production for each office and multiplied that number by

8.1 percent for the patient files. She then took the net production for each office and

multiplied that number by 25.3 percent for goodwill. Adding the two components,

Romney reached the total value of the practice to be $1,822,388.

Dr. Mark Paxton presented two valuation experts. Expert Charles Wilhoite

disputed Lenore Romney's conclusions that entity goodwill existed, and he argued that

her failure to consider the earnings of the practice invalidated her opinion. Wilhoite

testified:

> I didn't think there was any material level of institutional goodwill
> based on the fact the practice wasn't generating earnings sufficient enough
> to pay the practitioners at a level equal to market-based compensation.

RP at 472.

Mark Paxton's second expert, Scott Martin, valued only Spokane OMS, PLLC,

which purportedly held no assets itself, an anomaly that neither party mentions in this

appeal. On cross-examination, Dr. McLelland's attorney asked Martin:

13

> [COUNSEL:] . . . I take it since you were valuing the PLLC and instead of the entities that the assets were held in, you weren't aware that the assets were actually owned in undivided interest by Dr. McLelland and Dr. Paxton in their professional service corporations; is that a fair conclusion?
>
> [MARTIN:] I would say I didn't think about it that way when I was doing my valuation, yes.

RP at 552. Martin also admitted that he did not perform any valuation of assets of the practice as they existed as of February 28, 2015, the date of contractual dissolution. Nevertheless, Martin, even without considering the assets owned by the parties' professional service corporations, valued the practice's goodwill at $148,111 in 2013. He also found that, on April 30, 2014, the three locations of the practice comprised entity goodwill totaling $206,548. Because Martin believed that the practice lacked any goodwill after dissolution, he failed to provide any valuation for the practice's goodwill on or after February 28, 2015.

During his counsel's closing argument, Mark Paxton raised, for the first time, a contention that Bryan McLelland violated the partnership agreement by prematurely filing the lawsuit. According to Paxton, a partner in the practice could not sue for a division of assets until after the professional limited liability company dissolved under the terms of the partnership agreement. Spokane OMS was contractually dissolved on February 28, 2015, but McLelland filed suit on January 28, 2015. Counsel intoned during summation:

So if you go to Plaintiff's Exhibit 4, A at page 21, it defines default and it basically says these are some of the things that can be default and it lists out a number of them. Well, *one we've never talked about in this case* is at page 22-23 in Section 7-(viii), "Claims Against Other Parties or Shareholders." It states, "Claim against other Parties or Shareholders. Any of the Parties or any of the Shareholders"—and this is what—if they do it, it's a bad thing—"shall take any action, or fail to take any action, which results in any material claim, suit, or action being filed or threatened or asserted in any way against any of the other Parties or Shareholders. . ." The plaintiffs jumped the gun. They filed their lawsuit before the dissolution had occurred.

RP at 805 (emphasis added) (alteration in original).

The trial court issued a letter ruling. In the ruling, the trial court concluded that entity goodwill existed as of February 28, 2015. The court deemed location to be a critical factor in the goodwill value of the practice. The trial court adopted the goodwill value by location opined by Lenore Romney and thus attached a total value of goodwill for the practice at $1,822,388, to be split between the parties depending on the location or locations awarded each.

In the letter ruling, the trial court awarded McLelland P.S. the Post Falls location and Paxton P.S. the South Hill and Valley locations. To ensure an equal distribution of the total value of goodwill at the three practice locations, the trial court ordered Paxton P.S. to pay McLelland P.S. $414,036 as an equalization payment. The trial court also awarded 12 percent prejudgment interest on the equalization payment beginning August 4, 2014, to remedy Paxton P.S.'s use of its partner McLelland P.S.'s assets "without remuneration." CP at 3089-90. The trial court granted Paxton P.S.'s claim for

15

reimbursement for certain expenses at the Spokane Valley office and ordered McLelland

P.S. to pay Paxton P.S. $7,587.99 for those expenses.

The trial court denied the following claims asserted by Mark Paxton against Bryan

McLelland: (1) breach of fiduciary duty by reason of treating patients with a device and

treatment protocol named NuCalm, in which McLelland held an interest, (2) McLelland's

failure to inform Paxton of McLelland's ownership interest in NuCalm and American

Healthcare Lending, (3) breach of contract by reason of McLelland's purchase of a

Sullivan Road building, (4) breach of fiduciary duty related to McLelland's purchase of

the Sullivan Road building, and (5) breach of the partnership agreement by filing a

complaint before dissolution. Although the trial court already granted summary

judgment in favor of McLelland P.S. on its claims of breach of contract, breach of

fiduciary duty, and constructive fraud related to Paxton P.S.' eviction of the practice from

the South Hill location, the trial court concluded that McLelland P.S. suffered no

damages.

The trial court thereafter entered, in part, the following findings of fact:

Findings of Fact

2. In 2005, Dr. McLelland and another associate, Dr. Melanie Lang, each bought one-third of the practice.
3. Dr. McLelland purchased an undivided interest in the practice's assets, including equipment, furniture, fixtures, patient files, accounts receivable, supplies, and goodwill.
4. The total purchase price of the assets was $619,835. Of that amount, $261,667 was allocated to goodwill.

16

5.  To affect this purchase, Dr. McLelland's professional services corporation entered into a Partnership Agreement with Dr. Paxton's professional services corporation and the professional services corporation of Dr. Lang.  The Partnership Agreement acknowledged that Defendant Paxton, Dr. Lang, and Dr. McLelland were shareholders of the respective professional services corporations.  It also designated the three individuals as "Shareholders" for purposes of the Partnership Agreement.

6.  The Partnership Agreement stated that the goodwill of the Partnership shall be owned, or considered owned, in undivided interests by the Shareholders.

. . . .

10.  Shortly after Dr. McLelland and Dr. Paxton became equal partners in the practice [with the exit of Dr. Melanie Lang from the practice], ongoing differences between them led Dr. McLelland to give notice of his intent to terminate the partnership on August 4, 2014.  The partnership was judicially dissolved in February 2015; however, the parties continued to practice out of the same three locations, having divided up the staff and files by agreement. . . .

11.  The Partnership Agreement addresses termination of the practice as follows: "Upon the termination of this Agreement, and the necessary division of the jointly-owned Practice Interests, the Parties agree to negotiate, in good faith, so to divide such jointly owned Practice Interests.  Further, the Parties will then determine which of the Parties will continue to practice at each of the places of business of the Partnership."

. . . .

15.  Much of the trial was spent discussing the issue of goodwill of the practice.  When Dr. McLelland joined the practice as a partner in 2005, he purchased an undivided interest in the assets of Paxton's practice.  Those assets included furniture, fixtures, equipment, patient files, accounts receivables, supplies, and goodwill.  The total buy-in was $619,835.00; the goodwill portion was valued at $261,667.00.  The agreement was between the parties' professional corporations.  In 2014 when the parties purchased Dr. Lang's interests in SOMS [Spokane OMS], Dr. McLelland paid $265,000.00, of which $121,250.00 was for goodwill.  The Partnership Agreement allocates the goodwill of the practice to the parties in undivided interests.  The parties agreed to form a partnership utilizing the SOMS name and conducting business at the Valley and South Hill locations.  Upon termination of the partnership, the parties were to negotiate in good

17

faith and determine which of the parties will continue to practice at each of the places of business of the partnership.

16. Dr. McLelland offered the testimony of his expert, Lenore Romney. Lenore Romney valued the goodwill for each of the three locations using the fair market approach, summarizing net production by location and then using the multiple of 33.4%. Using this method, Dr. Paxton is required to pay an equalizing payment to Dr. McLelland in the amount of $414,036.00.

17. Ms. Romney testified that, in this practice, goodwill includes an assembled work force, in-place systems and procedures, locations of the practice, referral sources, continued patronage, and patient recommendations. Dr. Paxton had those features in 2005, and they were then transferred originally in a one-third undivided interest and now one-half undivided interest. As of February 2015, the practice still had a website, phone number, same staff, and locations. The termination language of the agreement contemplated that the parties would continue to utilize the assets of the partnership, including the locations. Thus, all the features Ms. Romney references as comprising goodwill of this practice continue to be utilized by parties at the various locations. Ms. Romney's valuation focused on the intangible value by office.

18. Goodwill is essentially "the monetary value of a reputation. It is the expectation of continued public patronage. It is a way of recognizing earnings not strictly attributable to the value of the work performed. It is distinguishable from the skill, education, and earning capacity of a practicing professional." Valuation of goodwill is a question of fact. There is no definitive formula for ascertaining the value of goodwill. . . .

19. The Court finds from the testimony and records that location is the most valuable asset of the practice after the practitioners themselves. Consequently, location in this particular case has value and comprises a large portion of entity goodwill. The parties understood this concept and agreed that each location was important enough to be recognized within the Partnership Agreement as an asset of the business that would continue on even if the partnership terminated.

20. Entity goodwill exists. The Court adopts Ms. Romney's valuations. The value of the goodwill for all three Practice locations as of February 28, 2015, was $1,822,388. Dr. McLelland and Dr. Paxton each own an undivided one-half interest in the practice goodwill. Equal distribution would allocate assets and/or cash to each in the amount of $911,194.00.

21. The value of the goodwill broken down by practice location and for purposes of distributing the undivided interests of the parties as of February 28, 2015 is as follows: Spokane Valley—$821,760.00; Post Falls—$497,158.00; and South Hill—$503,470.00.

22. The South Hill and Valley locations shall be awarded to Dr. Paxton. The Post Falls location shall be awarded to Dr. McLelland. This is based upon the request of Dr. McLelland which was not objected to by Dr. Paxton.

. . . .

33. Page 54 of the Partnership Agreement, Paragraph "D" provides for an award of attorney fees and costs to the prevailing party if an action at law or in equity is necessary to enforce the terms of the Agreement. This action sought to determine whether goodwill existed, its value, if any, and to divide up the practice locations, among other issues. In addition, breach of a fiduciary or contractual partnership duty is a recognized ground in equity for an award of attorney fees. Where neither party wholly prevails, the party who substantially prevails is the prevailing party. This determination turns on the extent of relief awarded the parties which is in this case favors the Plaintiff. Plaintiff prevailed on the issues of goodwill, breach of contract, NuCalm and American Healthcare Lending. Defendant prevailed on minor issues of reimbursement. Plaintiff's claims for "work days" and "theft" were dismissed prior to trial. Plaintiff substantially prevailed in this matter.

34. Plaintiffs are the prevailing party and are entitled to reasonable attorney fees in the amount . . . TO BE DETERMINED.

35. Prejudgment interest is appropriate in a partnership dissolution where one partner uses a former partner's assets without remuneration.

CP at 3084-89.

The trial court recognized Paxton P.S.' argument, in closing, that McLelland P.S. breached the partnership agreement by filing the lawsuit before dissolution of the partnership. The court rejected the argument.

In response to the trial court's award of reasonable attorney fees and costs to Bryan McLelland, McLelland's counsel submitted a fee affidavit that attached 158 pages

of detailed billing entries. The entries listed the task completed, the time taken to complete the task, and the identity of the attorney who completed the work. The affidavit averred that McLelland had incurred a total of $286,102.80 in attorney fees. McLelland did not seek recovery of $7,560.00 of those fees. The affidavit failed to segregate work performed on unsuccessful claims. The trial court initially entered a fee award of $286,102.80.

Mark Paxton moved for reconsideration of the attorney fees award and argued that the trial court failed to properly analyze and segregate, in Bryan McLelland's fee request, work performed on unsuccessful claims. In response to the motion, the trial court directed McLelland to segregate the fees. McLelland's counsel then submitted a 17 page declaration that identified attorney fees incurred in regard to the claims of work days, theft of money, theft of patients, and establishing the amount of damages for breach of fiduciary duties at trial. The supplemental declaration removed 92 billing entries. In total, counsel identified $9,194.75 in fees relating to attorney work on unsuccessful claims. The trial court accepted the new calculation performed by counsel and reduced Bryan McLelland's award of reasonable attorney fees and costs by $9,194.75.

The trial court entered a final order and judgment in favor of Bryan McLelland for the $414,036.00 equalization payment and $138,707.73 in prejudgment interest for a total of $552,743.73. The court also entered judgment for $276,908.05 in reasonable attorney fees and $53,675.50 in costs, for a total of $330,583.55 in fees and costs.

20

LAW AND ANALYSIS

This appeal concerns four subject matters: a premature lawsuit, goodwill, prejudgment interest, and reasonable attorney fees and costs. We address the subjects in such order.

McLelland's Premature Suit

*Issue 1: Whether Bryan McLelland filed suit early?*

*Answer 1: No.*

Mark Paxton complains that Bryan McLelland filed suit prematurely and thereby breached the partnership agreement. Paxton further argues that the breach negates McLelland's claim for a division of goodwill.

Section 7 of the partnership agreement addressed default, dissolution, and reconstituting. Paragraph A of the section allowed one party to dissolve the partnership agreement in the event of a list of actions by the other party that constituted a default. Mark Paxton claims he never performed any act or omission that constituted a default such that Bryan McLelland prematurely filed suit. We do not know if Paxton contends McLelland could never file suit.

We do not deem section 7 applicable to the lawsuit brought by Bryan McLelland, or at least that part that sought a division of assets, including goodwill. Instead, McLelland brought action to confer his right to terminate the partnership agreement after having given six months' notice and to divide the assets of the partnership converted to a

professional limited liability company. The partnership agreement did not require Paxton

to have defaulted for McLelland to file such a suit.

Bryan McLelland filed suit on January 28, 2015, one month before the date of

contractual dissolution on February 28, 2015. But no agreement provision precluded a

lawsuit before the contractual dissolution date.

Mark Paxton emphasizes the following paragraph found in the partnership

agreement:

> (viii) <u>Claim Against Other Parties or Shareholders</u>. Any of the
> Parties or any of the Shareholders shall take any action, or fail to take any
> action, which results in any material claim, suit, or action being filed, or
> threatened or asserted in any way against any of the other Parties or
> Shareholders, except fully insured malpractice claims (the deductible of
> which shall be paid by the Party or Shareholder who treated the patient
> making such malpractice claim), or which results in any material damage to
> or material liability of any of the other Parties or Shareholders.

CP at 51-52. The purpose of the paragraph is to list one of the grounds for default such

that the partnership can be dissolved. Paxton suggests that Bryan McLelland's suit is a

claim against a party or shareholder within the meaning of the paragraph. But the

paragraph addresses suits by third parties against one of the partners because of action

taken by the other partner. The paragraph does not prevent a partner from seeking an

accounting and division of assets as part of a dissolution.

Bryan McLelland asks us to decline to address Mark Paxton's contention that he

filed suit prematurely because Paxton failed to plead this claim or present any supporting

evidence during trial. Paxton raised this claim for the first time during defense counsel's closing argument at trial. We need not decide whether to decline Paxton's assignment of error because we rule in favor of McLelland on the merits.

Goodwill

*Issue 2: Whether the trial court erred when it denied Paxton P.S.'s motion for partial summary judgment on the issue of institutional goodwill, in its order dated June 17, 2016?*

*Answer 2: We do not address this issue because this court does not review a denial of a summary judgment motion.*

Through motions and at trial, Mark Paxton repeatedly argued that the oral and maxillofacial practice lacked any goodwill to be divided between Bryan McLelland and him or between their respective corporations. Paxton assigns three trial court errors related to his argument that the practice lacked goodwill. First, the trial court erred when denying Paxton's motion for partial summary judgment to dismiss McLelland's request for a division of goodwill value. Second, the trial court erred in concluding, after trial, that the PLLC had goodwill value as a matter of law. Third, the trial court abused its discretion in valuing the goodwill of the PLLC. Assignments of error one and two address whether the practice held any goodwill. Assignment of error three assumes the practice possessed goodwill.

We decline to address the first assignment of error. A summary judgment denial, whether right or wrong, cannot be appealed following a trial if the denial was based on a determination that material facts are disputed and must be resolved by the fact finder. *Canfield v. Clark*, 196 Wn. App. 191, 194, 385 P.3d 156 (2016); *224 Westlake, LLC v. Engstrom Props., LLC*, 169 Wn. App. 700, 715, 281 P.3d 693 (2012). When the case goes to trial, this court will review any issue in light of the full trial record. *224 Westlake, LLC v. Engstrom Props.*, *LLC*, 169 Wn. App. at 715.

Although perhaps not important, Mark Paxton erroneously contends that the trial court, in response to his summary judgment motion, held that Spokane OMS possessed goodwill as a matter of law. To the contrary, the court reserved for trial a ruling as to whether the practice held any goodwill.

*Issue 3: Whether a business entity providing professional services may enjoy goodwill separate from the individual professions practicing within the entity?*

*Answer 3: Yes.*

We splice Mark Paxton's assignments of error to the trial court's finding of goodwill into five related, but discrete contentions. First, the parties tasked the trial court with splitting the assets only of Spokane OMS, PLLC, a professional limited liability company, not the assets of the two oral surgeons, and, no business entity engaging in professional services ever has goodwill because the goodwill inheres in the professional, not the business. Second, assuming a professional limited liability company can possess

24

goodwill, under our unique circumstances, that entity or entities was Paxton P.S. and McLelland P.S., because Spokane OMS, PLLC only engaged in limited management functions. Third, a dissolved professional partnership lacks goodwill to distribute when the professionals conduct business in separate entities after dissolution. Fourth, Spokane OMS was not a going concern after dissolution and a business must be a going concern to enjoy goodwill. Fifth, the trial court assessed goodwill to the location at which the oral surgeons practiced, and, because the PLLC had abandoned its lease interests in those locations, the PLLC must not have retained any goodwill. We address each contention in such order after expounding on the nature of goodwill and listing some general principles about goodwill.

We find helpful lay descriptions of goodwill, before exploring the legal parameters of the esoteric concept. Goodwill is an accounting concept generally employed during the acquisition of an existing business. Goodwill is an intangible asset that cannot be seen or touched. Goodwill cannot be separated from the existing entity and cannot be sold, transferred, licensed, rented, or exchanged apart from the business. Goodwill amounts to the excess of the purchase price of a business over the net value of assets minus liabilities. Accountants employ goodwill to compensate for the fact that businesses, when purchased, are valued based on estimates of future cash flows and prices negotiated by the buyer and seller, and not on the fair value of assets and liabilities to be transferred by the seller. Goodwill blossoms from a business's brand name, trade

name, customer relationships, locations, memes, logos, patents, and proprietary technology.

Washington law deems goodwill to be an intangible property or asset defined as the "expectation of continued public patronage." *In re Marriage of Lukens*, 16 Wn. App. 481, 483, 558 P.2d 279 (1976). Other courts supply helpful definitions of goodwill. Goodwill is essentially the positive reputation that a particular business enjoys. *Butler v. Butler*, 541 Pa. 364, 378, 663 A.2d 148 (1995). Goodwill generally means the advantages that accrue to a business on account of its name, location, reputation and success. *Orbison v. Ma-Tex Rope Co.*, 553 S.W.3d 17, 29 (Tex. App. 2018).

Mark Paxton claims that Spokane OMS, PLLC and for that matter any professional partnership, limited liability company, or corporation, as a matter of law, lacks goodwill. Instead, according to Paxton, only individual professionals, such as engineers, physicians, dentists, and lawyers, who practice inside the rubric of the business entity, possess goodwill. The logical extension of Paxton's argument would preclude not only Spokane OMS, PLLC but also Paxton P.S. and McLelland P.S., from enjoying goodwill. Nevertheless, Paxton inconsistently contends that the two oral surgeons' professional service corporations, rather than the surgeons individually, possessed the goodwill emanating from the practice.

Some logic supports Mark Paxton's theory. Clients may seek services from a professional corporation or professional limited liability company only because they wish

assistance from a particular practitioner employed by the business entity. If that professional leaves the entity, the client follows the professional to his new location. Still, the logic falls short. The professional entity may engender a reputation for excellence on its own regardless of individual members of the entity. The business entity may have a location convenient for some clients or patients. A Pascoite may favor a Pasco law firm, and, when his lawyer inside that firm bolts to a Kennewick law firm, the client may choose to continue to patronize the Pasco firm.

Mark Paxton's contention also raises a false alternative. Paxton assumes that either the individual practitioner or the limited liability company possesses goodwill and not both. No reason exists to preclude the practitioner and the entity that employs the practitioner from both enjoying goodwill.

Some principles from Washington case law support the position that the professional business can have goodwill apart from the professionals inside the confines of the business. Goodwill is not the earning capacity itself. *In re Marriage of Hall*, 103 Wn.2d 236, 241, 692 P.2d 175 (1984). Goodwill is a distinct asset of a professional practice, not just a factor contributing to the value or earning capacity of the practice. *In re Marriage of Hall*, 103 Wn.2d at 241. Although both a practicing professional and a salaried professional enjoy earning capacity, only the practicing professional has a business or practice to which the goodwill attaches. *In re Marriage of Hall*, 103 Wn.2d at 241.

> Discontinuance of the business or profession may greatly diminish the value of the goodwill but it does not destroy its existence. When a professional retires or dies, his earning capacity also either retires or dies. Nevertheless, the goodwill that once attached to his practice may continue in existence in the form of established patients or clients, referrals, trade name, location and associations which now attach to former partners or buyers of the practice.

*In re Marriage of Hall*, 103 Wn.2d at 241. A distinction between earning capacity and goodwill suggests that a professional business entity may experience goodwill.

One foreign decision may support Mark Paxton's contention. In *In re Estate of McCubbin*, 125 Ill. App. 3d 74, 465 N.E.2d 672, 80 Ill. Dec. 560 (Ill. App. Ct. 1984), the Illinois court ruled that the estate of a deceased physician held no property interest in the continued practice. The court followed the rule that goodwill cannot exist as to other than purely commercial or trade partnerships or business of that nature, except by special contract. In a business of a professional nature, as that of an attorney, the goodwill attaches to the person rather than to any other subject because the client relies on the independent skill and judgment of the professional. Therefore, goodwill is not strictly applicable to a professional partnership.

The Mississippi court, in a divorce decision, echoed the ruling of the Illinois court. *Goodson v. Goodson*, 910 So. 2d 35, 38 (Miss. Ct. App. 2005). The Mississippi court observed that goodwill within a professional business depends on the continued presence of the particular professional individual as a personal asset and any value that may attach to that business as a result of that person's presence. The court reasoned that the wife's

painting service, deemed a professional business, enjoyed little, if any, goodwill separate from customer's views of the wife's skills and work ethic.

Other states hold that a professional business may possess goodwill apart from individual practitioners. In *Spaulding v. Benenati*, 57 N.Y.2d 418, 421-26, 442 N.E.2d 1244, 456 N.Y.S.2d 733 (1982), a widow sold her deceased husband's dental practice to another dentist. The sales agreement allocated $4,000 of the purchase price to goodwill. The purchasing defendant defaulted on payment. When the widow sued to recover amounts owed, the dentist contended, in part, that he need not pay the amount assigned to goodwill because goodwill of a deceased professional was not a saleable asset. The New York high court disagreed. The court noted the rule that the personal skill, judgment, and reputation of a professional person, whether deceased or living, is not a saleable item. The rule is based on the sound reasoning that the name, skill, judgment and reputation of a professional person is inseparable from that person and follows its possessor wherever he or she goes. Nevertheless, the purchasing dentist still incurred benefit from the deceased dentist's goodwill since the dentist gained the right to practice at the location formerly occupied by the deceased. The court noted that a professional practice gains goodwill by continuity of place and continuity of name. People living in the surrounding neighborhood who have regularly patronized a professional practice will continue to frequent that professional office even though the practice is being conducted by a different person. The extent of this probability depends on force of habit, convenience of

location, attractiveness of the premises, availability of convenient alternatives, and numerous other factors.

In a tax decision, *H&M, Inc. v. Comm'r of Internal Revenue*, 104 T.C.M. (CCH) 452 (2012), the Internal Revenue Service sought to characterize wage payments to a bank employee as disguised payments for the purchase by the bank of the employee's insurance brokerage business. The employee, a former insurance broker, did not own the business directly but through a corporation. The employee argued that the transfer of the brokerage business to the bank involved no goodwill, since a professional business lacks goodwill. The tax court disagreed. The court reasoned that a professional practice's goodwill can attach to both the professional and the business. The business, however, will lack saleable goodwill when the business of a corporation depends on the personal relationships of a key individual, unless he transfers his goodwill to the corporation by entering into a covenant not to compete or other agreement so that his relationships become property of the corporation.

In *Ford v. Ford*, 105 Nev. 672, 782 P.2d 1304 (1989), the court, in a marriage dissolution filing, held that the husband's solo medical practice possessed goodwill separate from the husband's continued presence in the practice. In *Evans v. Gunnip*, 36 Del. Ch. 589, 135 A.2d 128 (1957), the court held that an accounting partnership possessed goodwill apart from the individual accountants' skills and reputation.

Neither party cites *In re Marriage of Sedlock*, 69 Wn. App. 484, 849 P.2d 1243 (1993), which entails a marital dissolution involving an accountant. Without analyzing why, this court deemed that Thomas Sedlock owned no goodwill before he acquired an ownership interest in the accounting firm that employed him. Once he purchased an interest in the firm, goodwill accompanied his ownership. This decision may suggest that the business, not the professional, accrues goodwill.

We adopt the rule that a professional business entity may enjoy goodwill as the rule that best follows the phenomenon that some customers or clients chose to conduct business with the professional organization not only because of the individual skill of one professional inside the entity. We observe that Mark Paxton and Bryan McLelland never signed a covenant not to compete, and no evidence established that any one oral surgeon posed as a key employee of the oral and maxillofacial practice. Even the Illinois case recognized an exception to its ruling of the presence of a special contract. The Spokane OMS partnership agreement recognized the existence of goodwill.

*Issue 4: Did the trial court err in concluding, after trial, that Spokane OMS, PLLC had goodwill when the professional corporations of the oral surgeons rather than the PLLC engaged in the practice of oral and maxillofacial surgery?*

*Answer 4: No, in part because we disagree that the oral surgeons' professional corporations, to the exclusion of the PLLC, practiced oral surgery.*

31

We now move to the unique circumstances of this appeal and address Mark Paxton's contention that, even if a professional business entity may enjoy goodwill, Spokane OMS, PLLC did not. When arguing that the PLLC had no goodwill separate from the professional corporations of Mark Paxton and Bryan McLelland, Paxton cites no case law that addresses a similar situation of two professionals, each who incorporated himself, practicing together under the legal rubric of a partnership or a professional limited liability company. Instead, Paxton argues the facts.

We recall that paragraph 4F of the partnership agreement declares, in part, that the "goodwill of the Partnership shall be owned, or considered owned, by the Shareholders, in undivided interests, based on Percentage Ownership of the Partnership." CP at 45. Mark Paxton does not contend that the language precluded the trial court from granting an award to Bryan McLelland or his corporation for goodwill. The language would not preclude McLelland P.S. from obtaining recovery from Paxton P.S. if, on separation of the parties, Paxton P.S. received more practice locations than McLelland P.S.

The trial court found that the entity of Spokane OMS, PLLC experienced goodwill. We conclude that sufficient evidence supports this finding. Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of a premise. *Dixon v. Crawford, McGilliard, Peterson & Yelish*, 163 Wn. App. 912, 921, 262 P.3d 108 (2011).

Mark Paxton contends that Spokane OMS, PLLC did not provide medical services or treat patients. According to Paxton, the professional limited liability company managed and only operated the practice, paid taxes, and controlled the income and finances of the doctors. This argument tells a limited story.

As noted by expert valuator Lenore Romney, the professional limited liability company maintained locations and a website in its name. Spokane OMS maintained its own telephone number that patients called. The PLLC maintained its peculiar systems and procedures. Since the PLLC employed the staff, Spokane OMS, not the individual oral surgeons, possessed and maintained the patient files. Even the act of billing would be evidence of goodwill, since the patient would receive a bill from the PLLC, not from individual professional service corporations.

At the time of trial, the oral and maxillofacial practice still received patients and referrals directed to Spokane Oral & Maxillofacial Surgery, as opposed to the individuals' professional service corporations. Both surgeons continued to practice at all three practice locations, and the practice operated the same with regard to patient records, reputation, and an experienced work force as it did in 2005 when Bryan McLelland joined the practice.

In 2005, Bryan McLelland or his professional services corporation purchased an undivided interest in the assets of Mark Paxton's practice, including "equipment, furniture, and fixtures, accounts receivable, supplies, one of the buildings in which the

practice [was] operated, *goodwill*, and patient files." CP at 321 (emphasis added). Of the

$619,835 total purchase price, McLelland paid $261,667 for goodwill. Paxton's receipt

of money for goodwill injures his argument that individual practitioners, not the PLLC,

experienced goodwill. Likewise, McLelland and Paxton both purchased Melanie Lang's

goodwill in the practice when she left in 2014.

*Issue 5: May a dissolved partnership enjoy goodwill?*

*Answer 5: Yes.*

Mark Paxton next emphasizes that Spokane OMS, PLLC, under the terms of the

partnership agreement, contractually dissolved on February 28, 2015, six months after

Bryan McLelland gave his notice. On March 20, 2015, the superior court, by stipulated

order, judicially dissolved the partnership of McLelland P.S. and Paxton P.S. pursuant to

RCW 25.15.275, a former limited liability company statute. Paxton, therefore, contends

the PLLC, as a dissolved entity, lacked any goodwill at trial. Paxton again does not tell

the rest of the story. The trial court appointed a receiver to the end that Spokane OMS

would continue to conduct business. Although dissolved, the PLLC continued to exist in

the winding down phase.

Mark Paxton relies on *Harstad v. Metcalf*, 56 Wn.2d 239, 351 P.2d 1037 (1960)

when maintaining that, as a matter of law, a dissolved professional entity cannot possess

goodwill. In *Harstad*, James Metcalf, an electrical engineer, and H. T. Harstad, a civil

engineer, formed a professional engineering partnership. Metcalf later elected to dissolve

the partnership. The partners divided the office space, supplies, employees, and other physical assets. After Harstad completed additional partnership projects, Metcalf filed an action for an accounting and demanded compensation for his partnership interest, including an interest in the goodwill value in the partnership. Our Washington Supreme Court held that, since each partner continued his own engineering business after the division of the assets of the former partnership, no goodwill accrued in the respondent's business for which Metcalf was entitled to be paid.

We decline to follow *Harstad v. Metcalf* because of a critical factual difference. Spokane OMS, after dissolution, continued to utilize the assets of the professional limited liability company, which assets engendered goodwill. Those assets included locations, files, a website, a tradename, practices and procedures, and an experienced staff. According to Lenore Romney, all features that comprised the goodwill of the practice continued to be utilized by the oral surgeons at the various locations. Contrary to Mark Paxton's contentions, the trial court heard evidence that confirmed the surgeons practiced under the auspices of the PLLC, not their respective professional service corporations.

Although the parties often refer to Spokane OMS as a partnership, the entity was formally a professional limited liability company. Limited liability company law supports our ruling. A limited liability company continues after dissolution only for the purpose of winding up its activities. RCW 25.15.297(1). In winding up its activities, the company may "preserve the limited liability company's business or property as a going

concern for a reasonable time." RCW 25.15.297(2)(a). When the trial court judicially

dissolved the practice, the court appointed a receiver to supervise the dissolution process.

The receiver's authority included preserving the PLLC's business as a going concern for

a reasonable period of time until the division of assets and liabilities between the

partners. Until completion of trial, the details of the division of assets and liabilities had

not yet been determined. The trial court purposed to divide the parties' undivided interest

in the practice's assets. Consequently, the practice's value as a going concern was

preserved. The trial court was not precluded, as a matter of law, from finding that the

practice had goodwill because of the dissolution.

*Issue 6: Was Spokane OMS a going concern at the time of trial such that it could possess goodwill?*

*Answer 6: Yes.*

Mark Paxton raises a contention similar in nature to his contention that a dissolved

partnership cannot maintain goodwill. He contends that only a going concern can

experience goodwill. He then argues that, by trial, Spokane OMS, PLLC was not a going

concern.

Goodwill is an intangible element that inheres in the value of a going business.

*Bank of Washington v. Burgraff*, 38 Wn. App. 492, 499, 687 P.2d 236 (1984). Goodwill

cannot exist when the business is not a going concern. *Bank of Washington v. Burgraff*,

38 Wn. App. at 499. According to Mark Paxton, when applied to a corporation, or other

legal entity, "going concern" means that an entity continues to transact its ordinary business. *Denver v. Denver Union Water Co.*, 246 U.S. 178, 38 S. Ct. 278, 62 L. Ed. 649 (1918). The existence of goodwill is a question of fact. *In re Marriage of Knight*, 75 Wn. App. 721, 726, 880 P.2d 71 (1994); *In re Marriage of Hall*, 103 Wn.2d at 243 (1984).

The trial court found that the parties continued to conduct business under Spokane OMS, including the limited liability company's locations, files, a website, a tradename, practices and procedures, and an experienced staff. The court based this finding of substantial evidence including the explanation of expert Lenore Romney that use of those assets qualified Spokane OMS as a going concern.

*Issue 7: Did Spokane OMS lose any goodwill by abandoning its leases?*

*Answer 7: No.*

The trial court heavily relied on the opinions of Lenore Romney, who based her valuation on the operation of three locations: South Hill Spokane, Spokane Valley, and Post Falls. Mark Paxton next contends that the trial court erroneously concluded that the practice had goodwill value based on the leases of office space it controlled before its dissolution because it abandoned the leases.

Continued use of an established location poses as an important factor in determining goodwill. A factor comprising goodwill is location. *In re Marriage of Hall*, 103 Wn.2d at 241. A common definition of "goodwill" is the expectation that "'the old

customers will resort to the old place.'" *In re Marriage of Luckey*, 73 Wn. App. 201,

205, 868 P.2d 189 (1994) (internal quotation marks omitted) (quoting *In re Marriage of*

*Lukens*, 16 Wn. App. at 483 (1976)). So Mark Paxton correctly focuses on office

locations of Spokane OMS.

Mark Paxton relies heavily on *Bank of Washington v. Burgraff*, 38 Wn. App. 492

(1984). The facts in *Bank of Washington* become confusing because of many sales of a

restaurant business. The original owners of the restaurant, Leroy and Donna Burgraff

sold the business to Daniel and Antonina Madeja on contract. The contract of sale listed

the business as experiencing $44,000 in goodwill. The Burgraffs retained a secured

interest in the assets of the business, but their attorney failed to file a financing statement

to perfect the interest. The Madejas assigned their purchaser's interest in the restaurant to

Johnnie and Andrea Empleo. The Empleos financed their purchase through the Bank of

Washington, and the bank filed a financing statement to perfect a secured interest in the

assets of the business, including general intangibles of the business. The Empleos

abandoned the restaurant. The Burgraffs entered the premises and assumed payments on

the lease of the premises, under which the Empleos were the tenants. The Burgraffs then

resold the restaurant, including the rights to lease the restaurant building, to John and

Milagross Dumatol for $57,000.

The Bank of Washington sought to foreclose its security interest in the restaurant,

while claiming that it held an interest in the $57,000 proceeds from the sale of the

restaurant superior to the security interest held by the Burgraffs. The bank contended that some of the $57,000 represented goodwill in the business and its secured interest in general intangibles included the goodwill. The trial court found that the bank's secured interest did not extend to lease rights and that the business lacked any goodwill without the lease. Therefore, the bank could not foreclose on any goodwill of the business. The trial court also ruled that the Empleos no longer operated a going business and, for this additional reason, the bank could not foreclose on goodwill. Therefore, the bank could only recover the value of the equipment covered by its security agreement. The trial court valued the equipment at $6,000.

On appeal, in *Bank of Washington v. Burgraff*, the bank contended that, because the Dumatols purchased the restaurant business for $57,000 and the equipment was valued at only $6,000, the goodwill of the business had a value of up to $51,000. This court rejected the trial court's ruling that the business lacked any goodwill apart from the rights to lease the restaurant building. Nonetheless, the court held that the evidence supported the trial court's finding that, with regard to the Empleos, the restaurant was no longer a "going business" at the time of the sale. 38 Wn. App. at 500. The Empleos had abandoned their business when abandoning the lease for the restaurant. Therefore, there was no goodwill on which the bank could realize its interests.

From this holding, Mark Paxton contends that, like the restaurant owners in *Burgraff*, the oral and maxillofacial practice abandoned all of its leases in its locations,

39

which negated as a matter of law any finding of goodwill based on the locations. *Burgraff* turned on its facts, however. The Supreme Court recognized that whether or not an entity abandons a lease, and thereby its interest in goodwill, is a factual issue for the trial court to determine and will not be disturbed if supported by substantial evidence.

The trial record establishes that when Bryan McLelland triggered dissolution of the PLLC, the professional limited liability company ceased making lease payments. But the doctors' professional services corporations assumed payments and continued to operate the oral and maxillofacial practice at the same locations. No lease was ever abandoned. In his opening brief, Paxton cites to no relevant portion of the record to show that the doctors' practice abandoned all three of its leases. Paxton, in his reply brief, cites to report of proceedings pages 58, 601, and 6364 for the factual assertion that the oral and maxillofacial practice abandoned leases. Yet, pages 58 and 601 do not assist and page 6364 does not exist. Either Bryan McLelland or Spokane OMS were ejected from the South Hill location, but the ejection was the fault of Mark Paxton and constituted a violation of his fiduciary duty to McLelland and the professional limited liability company.

*Issue 8: Did the trial court, when ruling that Spokane OMS, PLLC held $1,822,388 in goodwill, erroneously include in its calculation the goodwill enjoyed by the oral surgeons' practices?*

*Answer 8: No.*

40

Mark Paxton argues that, even if we affirm the trial court's finding of the existence of goodwill, the trial court erred when adopting a value for the goodwill. He raises several arguments in support of this assignment of error.

First, Mark Paxton repeats previous arguments. He contends the trial court erroneously included the goodwill of the professional service corporations in its calculation. Paxton complains that only the individual professionals, and not the professional business entity, can enjoy goodwill. He contends the trial court assumed that the PLLC was a going concern, when it had dissolved. Paxton even contends that Lenore Romney testified that Spokane OMS was not a going concern, when she testified to the contrary. We have already held the professional limited liability company remained a going concern and that the company enjoyed goodwill.

Second, Mark Paxton challenges the market value methodology employed by expert Lenore Romney in calculating goodwill, which methodology the trial court adopted. While relying on *In re Marriage of Lopez*, 38 Cal. App. 3d 93, 113 Cal. Rptr. 58 (1974), Mark Paxton claims the "future receipts" method for valuing a professional practice presents the only proper method of valuation of goodwill. Contrary to Paxton's contention, neither *Lopez* nor Washington case law support his contention. In fact, the *Lopez* court emphasized that "no rigid or unvarying rule has been enunciated by our courts for determining the existence or value of the 'goodwill' of a law practice or any other profession as a going business, and therefore each case must be determined upon its

41

own facts." *In re Marriage of Lopez*, 38 Cal. App. 3d at 109. Washington case law

mirrors *Lopez*'s reminder. Washington does not demand that an evaluator employ any

particular method of measuring goodwill. *Dixon v. Crawford, McGilliard, Peterson &*

*Yelish*, 163 Wn. App. at 922 (2011).

Washington courts recognize five methods or formulas in valuing goodwill. *In re*

*Marriage of Hall*, 103 Wn.2d at 243. Three of the formulas come from accounting

formulas: the straight capitalization method, the capitalization of excess earnings method,

and the Internal Revenue Service variation of capitalized excess earnings method. The

fourth method, the market value approach, sets a value on professional goodwill by

establishing what fair price would be obtained in the current open market if the practice

were to be sold. *In re Marriage of Hall*, 103 Wn.2d at 244. The fifth method is the

buy/sell agreement method. While our Supreme Court has recognized the five methods

in valuing goodwill, these methods are not the exclusive formula's available to the trial

courts in analyzing the evidence presented and one or more of the methods may be used

to value goodwill of a practice. *In re Marriage of Hall*, 103 Wn.2d at 245.

Since the law recognizes no definitive formula for ascertaining the value of

goodwill, we conclude that the trial court could have accepted expert Lenore Romney's

valuation of goodwill based on a market value on a going concern basis. Romney's

method may have even incorporated some features of the future receipts method since the

calculation recognized the future income at each location.

Prejudgment Interest

*Issue 9: Was Bryan McLelland entitled to prejudgment interest on his $414,036 award?*

*Answer 9: No.*

After equalizing the goodwill found at the three locations, only one of which the court assigned to Bryan McLelland, the court awarded McLelland the sum of $414,036. The court then awarded McLelland interest on the award beginning the date of the partnership dissolution. On appeal, Mark Paxton contends the trial court erred in granting McLelland prejudgment interest since the goodwill award was not a liquidated sum. McLelland contends that RCW 25.05.250(2) affords him this interest award.

Prejudgment interest awards are based on the principle that a defendant who retains money belonging to another should be charged interest thereon. *Prier v. Refrigeration Eng'g Co.*, 74 Wn.2d 25, 34, 442 P.2d 621 (1968). The law affords the plaintiff compensation for the use value of the money representing his damages for the period of time from his loss to the date of judgment. *Hansen v. Rothaus*, 107 Wn.2d 468, 473, 730 P.2d 662 (1986). Nevertheless, the law limits the circumstances under which a defendant who retains money owed another must pay prejudgment interest.

Washington courts generally only award prejudgment interest on a liquidated or readily assessed claim as opposed to an unliquidated claim. *Hansen v. Rothaus*, 107 Wn.2d at 472. A liquidated claim arises from the availability of data which, if believed,

makes it possible to compute the amount with exactness, without reliance on opinion or

discretion.  *Prier v. Refrigeration Eng'g Co.*, 74 Wn.2d at 33.  Bryan McLelland does not

contend that the award of goodwill was based on a liquidated amount.  He agrees the trial

court relied on opinion when assessing the amount of the goodwill.

Bryan McLelland asserts that a partnership statute affords him prejudgment

interest.  RCW 25.05.250 declares:

> (1) *If a partner is dissociated from a partnership without resulting in a dissolution and winding up of the partnership business under RCW 25.05.300,* the partnership shall cause the dissociated partner's interest in the partnership to be purchased for a buyout price determined pursuant to subsection (2) of this section.
> (2) The buyout price of a dissociated partner's interest is the amount that would have been distributable to the dissociating partner under RCW 25.05.330(2) if, on the date of dissociation, the assets of the partnership were sold at a price equal to the greater of the liquidation value or the value based on a sale of the entire business as a going concern without the dissociated partner and the partnership were wound up as of that date. Interest must be paid from the date of dissociation to the date of payment.
> (3) Damages for wrongful dissociation under RCW 25.05.230(2), and all other amounts owing, whether or not presently due, from the dissociated partner to the partnership, must be offset against the buyout price.  Interest must be paid from the date the amount owed becomes due to the date of payment.

(Emphasis added.)

We note that the dispute between Bryan McLelland and Mark Paxton concerned

the dissolution of a professional limited liability company, not a partnership, and

RCW 25.05.250(2) applies only to partnership dissolutions.  The limited liability

company statutes do not contain a similar interest provision. Despite our dissolution involving a limited liability company, we recognize that the court could apply a partnership statute. If parties treat a corporation as a partnership, the court will treat the corporation as a partnership. *Kalez v. Miller*, 20 Wn.2d 362, 147 P.2d 506 (1944).

We decline an award of prejudgment interest for another reason. One partner did not leave the partnership or business without a resulting dissolution. RCW 25.05.300 et seq., not RCW 25.05.250(2), controls the dissolution of a partnership. RCW 25.05.330 governs settlement of accounts and contributions among partners. None of the dissolution statutes afford a recovering party an award of prejudgment interest.

We do not know if Bryan McLelland relies on partnership law outside the confines of RCW 25.05.250(2). Nevertheless, McLelland relies on *Green v. McAllister*, 103 Wn. App. 452, 14 P.3d 795 (2000) and *Dixon v. Crawford, McGilliard, Peterson & Yelish*, 163 Wn. App. at 925 (2011) for the broad proposition that interest should be awarded in any partnership dispute. We decline to apply *Green* and *Dixon* outside the confines of RCW 25.05.250(2). In *Dixon v. Crawford, McGilliard, Peterson & Yelish*, one partner voluntarily left a partnership and the partnership continued to function without any dissolution. In *Green v. McAllister*, the court applied former RCW 25.04.420 (1955) that provided a withdrawing partner interest on a recovery from the date of dissolution. No such statute now appears in the code.

In his responding appeal brief, Bryan McLelland did not seek recovery of prejudgment interest under the parties' partnership agreement. In a statement of additional authorities, McLelland cites language from the partnership agreement that affords a prevailing party an award of prejudgment interest. An appellate court will not entertain an argument raised for the first time in a supplemental brief. *Nw. Wholesale, Inc. v. Pac Organic Fruit, LLC*, 184 Wn.2d 176, 200 n.19, 357 P.3d 650 (2015). Based on this rule, we will not consider a contract term first cited and an argument raised impliedly for the first time in a statement of additional authorities.

Prevailing Party for Award of Reasonable Attorney Fees

*Issue 10: Was Bryan McLelland the prevailing party for purposes of an award of reasonable attorney fees and costs under the partnership agreement?*

*Answer 10: Yes.*

Mark Paxton contends that Bryan McLelland was not entitled to recover his fees at trial because he was not the substantially prevailing party within the meaning of the partnership agreement attorney fees clause. Under statute, a contract may provide that attorney fees and costs, which are incurred to enforce the provisions of the contract, shall be awarded to the prevailing party. RCW 4.84.330. Paragraph 17D of the partnership agreement afforded the "prevailing party" recovery of reasonable attorney fees and costs.

The prevailing party is generally the one who receives an affirmative judgment in its favor. *Riss v. Angel*, 131 Wn.2d 612, 633, 934 P.2d 669 (1997). When neither party wholly prevails, the court should award fees to the substantially prevailing party, and the identity of the substantially prevailing party depends on the extent of the relief afforded the parties. *Riss v. Angel*, 131 Wn.2d at 633. This court reviews a trial court's determination of reasonable attorney fees for manifest abuse of discretion. *Rainier Nat'l Bank v. Lewis*, 30 Wn. App. 419, 424, 635 P.2d 153 (1981).

Mark Paxton first argues that, if we reverse Bryan McLelland's award of goodwill, McLelland no longer qualifies as the prevailing party. Paxton highlights that the trial court commented that the question of goodwill posed as the principal issue in the suit. We agree with Paxton that, if we reversed the award of goodwill, we should reverse the award of reasonable attorney fees and costs. But we confirm the award of goodwill. The fact that the claim of goodwill constitutes the substantial issue confirms the propriety of the trial court's identity of Bryan McLelland as the prevailing party for purposes of fees and costs.

### Fee Amount

*Issue 11: Whether the trial court abused its discretion when awarding Bryan McLelland the sum of $276,908.05 in reasonable attorney fees?*

*Answer 11: No.*

47

Mark Paxton next argues that, even if Bryan McLelland was the prevailing party for purposes of an award of reasonable attorney fees, the trial court erred in setting the amount of fees. Paxton challenges the trial court's award to McLelland of $276,908.05 in attorney fees, which included McLelland's $9,194.75 reduction in fees related to counsel's work on unsuccessful claims.

This court will uphold a reasonable attorney fee award unless it finds that the trial court manifestly abused its discretion. *Ethridge v. Hwang*, 105 Wn. App. 447, 460, 20 P.3d 958 (2001). We afford the trial judge broad discretion in determining the reasonableness of an award of attorney fees. *Scott Fetzer Co. v. Weeks*, 122 Wn.2d 141, 147, 859 P.2d 1210 (1993).

The fee applicant bears the burden of demonstrating the reasonableness of a fee request. *Scott Fetzer Co. v. Weeks*, 122 Wn.2d at 151. An attorney fee request must be documented by contemporaneous records documenting the hours worked. *Mahler v. Szucs*, 135 Wn.2d 398, 434, 957 P.2d 632 (1998). The documentation need not be exhaustive, but must inform the court of the number of hours worked, the type of work performed, and the category of attorney who performed the work. *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 597, 675 P.2d 193 (1983).

To determine reasonable attorney fees, the trial court begins with a calculation of the "lodestar," which equals the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Mahler v. Szucs*, 135 Wn.2d at 434 (1998). Since

the court must limit the lodestar to hours reasonably expended, the court should discount hours spent on unsuccessful claims, duplicated effort, or otherwise unproductive time. *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d at 597. Trial courts must take an active role in assessing the reasonableness of fee awards. *Mahler v. Szucs*, 135 Wn.2d at 434. A trial court does not need to deduct hours here and there just to prove to the appellate court that it has taken an active role in assessing the reasonableness of a fee request. *Miller v. Kenny*, 180 Wn. App. 772, 823, 325 P.3d 278 (2014).

Mark Paxton contends that Bryan McLelland's counsel presented imprecise documentation of time expended on tasks. He complains about block billing. Although we frown on block billing, Paxton does not identify any particular entry as excessive in time or any block entry that causes difficulty in determining the amount of time for various tasks.

Bryan McLelland's counsel submitted 158 pages of detailed billing entries that listed the task completed, the time expended on the task, and the identity of the attorney completing the work. For example, on June 4, 2015, in regard to Michael Church's time, counsel billed 1.60 hours to

> [r]eview and respond to emails from Dave Kulisch; Review emails and attachments from Jenae Ball; Review proposed orders; [and] Review email from client.

CP at 3133.

The trial court entered its original fee award of $286,102.80. Mark Paxton moved for reconsideration and argued that the court failed to properly analyze and segregate time spent on losing claims in Bryan McLelland's fee request. Paxton wonders how the segregation amounted to only a reduction of $9,000.

After the trial court granted Mark Paxton's request for segregation, Bryan McLelland's counsel submitted a 17 page declaration addressing the reduction of attorney fees in regard to the claims of work days, theft of money, theft of patients, and establishing the amount of damages for breach of fiduciary duties at trial. McLelland's revised fees in the declaration identified entry by entry precisely which hours in the prior billing statement were related to unsuccessful claims. For example, entry number 59 read:

> Page 000097. On 4/23/16, DMD billed 3.3 hours for "prepare for deposition—substantive topics; extensive deposition preparation for Bryan; work on summary judgment argument." The amount of .8 hours is related to the claims of work days, theft of patients and theft of money. Pursuant to the Court's Order, .8 hours is withdrawn from the calculation of fees awarded.

CP at 3526.

Bryan McLelland's counsel also provided a second supplemental declaration further explaining the calculation utilized to arrive at the time the attorneys spent on the four claims at issue for the reduction. The reduction in the declaration was accomplished by a careful review of all billing statements, thousands of pages of correspondence,

e-mail, pleadings, and discovery requests and responses.  In total, McLelland identified

$9,194.75 in fees relating to attorney work on unsuccessful claims.  The trial court, in its

order denying defendants' motion to clarify and amend judgment, found that detailed

calculations explained each reduction taken and satisfied the trial court's prior order

requiring segregation.  The evidence supported this ruling.  The trial court did not abuse

its discretion when awarding fees of $276,908.05.

Attorney Fees on Appeal

Both parties seek an award of reasonable attorney fees and costs incurred on

appeal pursuant to the partnership agreement attorney fees clause.  Because Mark Paxton

does not substantially prevail on appeal, we deny him an award.  Because we hold in

favor of Bryan McLelland on the principal question on appeal, the question of goodwill

and three other questions, we conclude that McLelland substantially prevails on appeal,

and we award him reasonable attorney fees and costs.  We direct McLelland's counsel to

exclude, however, from the hours of work for purposes of the award, all work performed

on the issue of prejudgment interest.

CONCLUSION

We affirm all trial court rulings, except for the court's award of prejudgment

interest.  We remand for the superior court to strike interest accruing before judgment.

Interest will now accrue beginning with the date of the original judgment.  We award

Bryan McLelland reasonable attorney fees and costs incurred on appeal, excepting the

51

No. 35401-6-III
*McLelland DDS v. Paxton DDS*

portion of fees and costs incurred for responding to Mark Paxton's argument with regard

to prejudgment interest.

Fearing, J.

WE CONCUR:

Lawrence-Berrey, C.J.

Pennell, J.